**NETWORK TOWERS, LLC,**
**Appellant–Plaintiff,**

v.

**BOARD OF ZONING APPEALS OF LaPORTE COUNTY, INDIANA,**
**Appellee–Defendant.**

No. 46A03–0110–CV–326.

Court of Appeals of Indiana.

June 19, 2002.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Plaintiff–Appellant, Network Towers LLC (Network), appeals the findings of fact and conclusions of law made by the Board of Zoning Appeals of LaPorte County, Indiana (the "Board"),.

We reverse and remand.

### ISSUE

Network raises several issues for review, one of which we find dispositive and restate as follows: whether the Board erred in denying Network its Petition for Conditional Use Permit.

### FACTUAL AND PROCEDURAL HISTORY

Network is a limited liability company in the business of constructing and maintaining wireless communications towers, and maintains an office in Fort Wayne, Indiana. Centennial Communications (Centennial) contracted with Network for the construction of a 250–foot wireless communications tower in Union Township, Indiana. To that end, Network entered into a lease with Bruce Wolff for a .0147–acre lot (the "real estate") located near the town of Hamlet, Union Township, Indiana, in an area zoned R–2.

At all relevant times, LaPorte County Zoning Ordinance (the "Ordinance"), Sec. 8–22, stated:

**Paging Towers/Wireless Communications Placement:**

. . .

B. Location

Any wireless communications facility must qualify under the following standards as a permitted use or a conditional use:

. . .

4. Tower placement.

1. At least Fifty (50) feet greater that (sic) the tower height from any property boundary and Five Hundred (500) feet from any residential structures.

2. One thousand (1,000) feet from any R1, R2, or R3 zoned districts.

3. Fifty (50) feet greater than the tower height from any public road.

4. No tower placement shall be within five (5) miles of any existing tower.

5. Cannot be greater than Two Hundred and Fifty (250) feet in height.

6. Any tower greater than One Hundred and Fifty (150) feet must be capable of co-location of at least four (4) users.

(Appellant's Appendix p. 31).

Because the real estate was within 1000 feet of a residential zone, within 500 feet of a residential building, and within five (5) miles of another wireless communications tower, Network's proposed tower could not qualify as a permitted use. In such a case, the Ordinance provided for a conditional use permit, but only under the following provision:

C. Conditional Uses

The Board of Zoning Appeals shall approve or deny conditional use permit applications for wireless communications facilities based on consideration of the following factors:

1. Whether the facility will offer potential opportunities for co-location;

2. Whether all applicable development standards will be met;

3. The previous or existing use of the site and its impact on surrounding properties;

4. Compatibility of the proposed use with the existing use of the site and existing neighboring uses;

5. The extent to which granting the conditional use would substantially serve the public safety and welfare;

6. The particular physical suitability of the site for the proposed use; and

7. Whether conditions may be imposed by the Board or commitments made by the applicant which are sufficient to mitigate any potential adverse impact on neighboring property.

(Appellant's App. p. 25).

To obtain a conditional use permit, Network had to submit a written application in compliance with the Ordinance, Sec. 8–22(E), which required, among other things, the following demonstration:

An application for a zoning clearance permit or conditional use approval for a wireless communications facility shall be submitted to the County Planning and Zoning Office and shall comply with the requirements set forth below:

1. Tower application

a. Co-location requirements

An application for a zoning clearance permit or a conditional use permit for a new tower shall not be considered unless the applicant demonstrates to the satisfaction of the Board of Zoning Appeals that no existing tower, structure, or building can accommodate the proposed antenna due to one or more of the following reasons:

1. No existing or approved towers, structures, or buildings are located within the geographic area needed to meet the applicant's engineering requirements.

2. No existing or approved towers, structures, or buildings are of sufficient height or structural capacity to meet the applicant's engineering requirements.

. . .

### b. Documentation

An application for a zoning clearance permit or a conditional use permit for a new tower shall include the following documentation:

1. Documentation of inability to comply with co-location requirements.

. . .

### 3. Conditional use application

An applicant for approval of a conditional use permit for a wireless communications facility shall:

 a. Provide an explanation of why the facility cannot be located on a site for which it would be a permitted use.

(Appellant's App. pp. 27–9).

On October 2, 2000, Network filed a Petition for Conditional Use for a Wireless Communications Facility (the "Petition"). In its Petition, Network alleged that there was no existing structure, within the relevant geographical area, of sufficient height or structural capacity to meet Network's engineering requirements. Network supported its allegation of an inability to co-locate, as required by the Ordinance, Sec. 8–22(E)(1)(b), by attaching to its Petition an "Engineering Statement in support of proposed Network Towers, LLC communications tower at Kingsford Heights, IN" which stated, among other things, that:

Centennial Communications is licensed by the FCC to provide cellular service to LaPorte County.... Centennial identified a need to improve service in Kingsford Heights. In order to provide service at the earliest possible date, Centennial first evaluated existing and previously approved towers for suitability. It identified one existing tower belonging to Lodestar located in the adjacent community of Kingsbury and one approved (but not constructed) tower in the community of South Center.

As a cellular licensee, Centennial has to meet certain service responsibilities stipulated by the FCC.... The ability to satisfy the FCC standards is highly dependent on achieving adequate signal strength in any area. Populated communities require higher signals because of the inherent signal loss when communicating with hand held units operated inside buildings. Consequently the most satisfactory communication systems are those comprising towers located closer to the targeted communities so that the signals are strong enough to penetrate the buildings.... Centennial has discovered over more than 10 years of operational experience that, for adequate in-building service, transmission locations should be within 2 miles of the building where service is required. Evaluation of the alternative towers showed that none met this criterion.

. . .

Network Towers was ... further instructed to attempt to achieve a location close to the point at which US6 bends from following an east/west route to a north south route. This is because transmission locations which are aligned with highway rights of way produce optimum coverage results thus minimizing the need for additional towers. The presently proposed location meets these principal requirements.

(Appellant's App. p. 58).

On October 17, 2000, Network appeared before the Board for a public hearing on its Petition. Charles Koifer testified on behalf of Network and Centennial that gaps existed in Centennial's coverage area, and customers were complaining about losing signal strength. Koifer's testimony also corroborated the engineering state-

ment included with the Petition, to the effect that no present tower or other structure was capable of meeting Centennial's service needs. Network also demonstrated, among other things, that (1) the proposed tower had room for co-location by three additional carriers, (2) all development standards specified in the Ordinance would be met, (3) the existing use of the site was agriculture, and that use would continue after the tower was constructed, and (4) that the proposed location served the public interest by providing sufficient coverage to fill the gaps in Centennial's service.

Two remonstrators spoke against the Petition, based on their aesthetic concerns and the potential for a reduction in their property values due to the proximity of Network's proposed tower to their own property. None of the remonstrators, however, submitted any evidence other than their personal opinion. At the conclusion of the hearing, one of the Board members moved to deny Network's petition because "he ha[d] not been successfully convinced that another tower will not work for them." (Appellant's App. p. 46). The motion was seconded and carried.

Sometime later[1], the Board issued written Findings of Fact and Conclusions of Law (the "Findings"), which stated, in pertinent part:

> The purpose of such Petition was for variance to construct a 250 foot wireless communications tower within the 1000 foot setback from an [sic] R1, R2, and R3 districts as well as within a five (5) mile limit of any existing towers and within a 500 foot setback from residential structures as located at 1502 E. U.S. Highway 6, Union Township currently zoned R2 and on 0.147 acres.

After hearing all the evidence to be presented, the Board of Zoning Appeals makes the following findings of facts and conclusions of law:

1. That pursuant to the LaPorte County Zoning Ordinance, a variance is need [sic] for the location of such tower at this vicinity in relation to residential districts and the existing residential structures.

2. That there are other towers within the five (5) mile radius for which co-locators can be utilized.

3. That the location of such tower and direct proximity of residential parcels will have an effect on residential land valuations.

4. That strict application and terms of the Zoning Ordinance does not constitute unnecessary hardship as applied to this property based on the proximity of the existing towers and their location and available [sic] of co-location.

5. That there is no need for the variance to arise from a condition peculiar to the property involved because other sites viewed that [sic] are not located close to residential structures.

6. This Petition should be denied.

Network appealed this decision to the trial court, which affirmed summarily the decision of the Board.

Network now appeals.

## DISCUSSION AND DECISION

### I. Conditional Use Permit

 At the outset, we note that the Board, in its Findings, refers to the conditional use permit available under the Ordinance as a "variance." As we explained in *Eberhart v. Indiana Waste Systems, Inc.,* 452 N.E.2d 455, 459 (Ind.Ct.App.1983):

---

1. The Board's decision was not dated.

A conditional use is not a variance. The primary difference between the two is that a conditional use is not an exceptional use. A conditional use is a desirable use which is attended with detrimental effects which require that certain conditions be met before it can be established at a given location. While a variance is a departure from the terms of an ordinance, a conditional use is a permitted use under the terms of the ordinance, so long as the enumerated conditions are met.

*Id.* (citations omitted). The Ordinance before us quite clearly specifies that it provides for a conditional use permit, not a variance. For that reason, the Board's Findings Nos. 1 and 5 are incorrect as a matter of law by referring to Network's Petition as one for a variance instead of a conditional use.[2]

■ This distinction is not a matter of semantics only. These two zoning proceedings differ significantly in the evidentiary burden they impose on the party seeking the use.

The granting of a variance is a matter committed to the discretion of boards of zoning appeal, whereas the granting of a special exception is mandatory once the petitioner shows compliance with the relevant statutory criteria.

*Town of Merrillville Bd. of Zoning Appeals v. Public Storage, Inc.*, 568 N.E.2d 1092, 1094 (Ind.Ct.App.1991). For this reason, we have observed that the standards for a special, or conditional, use permit are less stringent than those for a variance, because the former enjoys legislative sanction while the latter does not. *Boffo v. Boone County Bd. of Zoning Appeals*, 421 N.E.2d 1119, 1124 (Ind.Ct.App. 1981).

This is not to say that Network was automatically entitled to the permit upon a prima facie demonstration that its tower would comply with the conditions enumerated in the Ordinance. As we observed in *Crooked Creek Conservation and Gun Club, Inc. v. Hamilton County North Bd. of Zoning Appeals*, 677 N.E.2d 544, 547 (Ind.Ct.App.1997), *trans. den'd:*

[S]ome special exception ordinances are regulatory in nature and require an applicant to show compliance with certain regulatory requirements (e.g. structural specifications), providing the zoning board with no discretion, [while] some special exception ordinances provide a zoning board with a discernable amount of discretion (e.g. those which require an applicant to show that its proposed use will not injure the public health, welfare, or morals).

*Id.* Here, one of the conditions for obtaining a conditional use permit for the tower was "[t]he extent to which granting the conditional use would substantially serve the public safety and welfare." (Appellant's App. p. 25). Thus, the Board had the discretion to deny the Permit, even if Network met all the other conditions, provided the evidence supported a finding that the tower would not serve the public welfare. Here, there was no such finding.

At this point, the Board's order rests on two written factual findings: 1) construction of Network's tower would affect property values, and 2) Centennial could co-locate on another tower in the area. The latter finding also served as the basis for the Board's oral motion to deny Network's permit. We shall review both in turn.

## II. Standard of Review

■ This court and the trial court are bound by the same standard when

---

**2.** Likewise, Finding No. 4 is incorrect as a matter of law because the "unnecessary hard-

ship" standard applicable to variances is nowhere mentioned in this Ordinance.

reviewing the decision of a board of zoning appeals. *Crooked Creek Conservation,* 677 N.E.2d at 547. Our review begins with the presumption that the Board, due to its expertise in zoning matters, reached a correct decision. *Porter County Bd. of Zoning Appeals v. Bolde,* 530 N.E.2d 1212, 1215 (Ind.Ct.App.1988). Because of their expertise, it is the Board's duty to make findings of fact. *Id.* We may only review the Board's findings to determine whether they are supported by evidence in the record. *Id.* If our review reveals, however:

> that the evidence upon which the board of zoning appeals acted was devoid of probative value, that the quantum of legitimate evidence was so proportionately meager as to lead to a conviction the board's finding does not rest on a rational basis, or that the result of the hearing must have been substantially influenced by improper considerations, the board's order will be set aside.

*Newman v. Spence,* 565 N.E.2d 350, 353 (Ind.Ct.App.1991).

### III. Substantial Evidence

 The Board was required to make written findings of fact in support of its decision denying Network's request for a conditional use permit. Ind.Code § 36–7–4–915. Network argues that the Board's Findings are not supported by substantial evidence. In the context of zoning adjudications, "[w]e will set aside specific findings only if they are clearly erroneous, meaning the record lacks any facts or reasonable inferences supporting them." *Ripley County Bd. of Zoning Appeals v. Rumpke of Indiana, Inc.,* 663 N.E.2d 198, 204 (Ind.Ct.App.1996). A zoning board abuses its discretion when it

makes findings that have no evidentiary support. *Boffo,* 421 N.E.2d at 1125. Moreover, the findings must be tailored to address the specific facts presented to the Board. *Metropolitan Bd. of Zoning Appeals, Div. II, Marion County v. Gunn,* 477 N.E.2d 289, 300 (Ind.Ct.App.1985). "These basic findings of fact are not sufficient to support the Board's ultimate findings if they are merely a general replication of the requirements of the ordinance at issue." *Id.* Thus, "[w]e have held that this duty includes a requirement that a BZA enter both specific findings of fact and ultimate findings, or determinations." *Town of Merrillville,* 568 N.E.2d at 1095. Specific findings necessarily incorporate the basic facts upon which the determination is based. *Id.*

Network argues that the Board's conclusory findings fail to adequately articulate a factual basis, rendering them inadequate as a matter of law. We agree. The Board's Findings amount to nothing more than conclusory findings unsupported by factual findings. For that reason, they are inadequate. *Id.* Unless these ultimate findings are supported by facts in the record, the Board will be found to have abused its discretion. *Boffo,* 421 N.E.2d at 1125.

#### a. Residential land values

 Network takes issue with the Board's Finding No. 3: that the tower "will have an effect on residential land valuations."[3] (Appellant's App. p. 63). We first note that the Ordinance does not refer to a tower's potential impact on land valuations. Instead, it refers to a tower's "impact on its surrounding properties" and "[c]ompatibility of the proposed use with the existing use of the site and existing

---

**3.** We will assume, from the context of the order, that this finding refers to negative impacts.

neighboring uses." (Appellant's App. p. 25). At the public hearing on Network's Petition, Koifer testified that the tower would not be injurious to, nor materially change, the character of the surrounding area; that the use of the real estate for a tower was compatible with the surrounding agricultural use; that the tower would not interfere with Wolff's plan to pasture cattle in the vicinity of the tower; and that Network would be disturbing only their 80 foot by 80 foot leasehold area. Network never addressed the tower's potential impact on property values specifically, but then it was not required to do so under the language of the Ordinance.

The only support in the record for the Board's finding of an adverse impact on property values consists of the opinion of two remonstrators who lived in the vicinity of the proposed tower. Their statements were limited to personal opinions based on aesthetic preferences only. When asked by a Network representative what evidence they had to support their claim of negative impacts, one remonstrator mentioned the potential adverse health effects of microwaves, to which Network responded with assurances that the FCC had regulations in place to minimize any potential health effects, and that the results from various health studies to date indicated that there were no known adverse health impacts from low-frequency radio waves.

Without any factual evidence to support a finding of decreasing property values, the Board's Finding No. 3 cannot stand. *See, e.g., Town of Merrillville,* 568 N.E.2d at 1095.

### b. Co-location

■ Network also takes issue with Finding No. 2, which states: "there are other towers within the five (5) mile radius for which co-locators can be utilized."

Network argues here, as it did to the Board, that it needed to locate its tower on the Wolff real estate in order to provide wireless communications service to the specific geographic area affected by the gap in Centennial's coverage. Thus, while co-locating elsewhere was physically possible, "Network would not, through that co-location, be able to provide the necessary coverage." (Appellant's Brief at 7). As Centennial's engineer attested to in his statement, and as Koifer stated at the hearing, only two towers existed within a five-mile radius of the real estate, and one was too far away, while the other was too short.[4] In contrast, there was no testimony to the effect that the two other towers were a viable option for Network, only assumptions. Thus, we agree with Network that there was no evidence presented at the hearing to support even an inference that the other towers could meet Network's needs.

### c. Denial of permit

At the conclusion of the public hearing, one of the Board members moved to deny the permit because "he ha[d] not been successfully convinced that another tower will not work for them" and because "another tower within a five mile radius can be utilized by them." (Appellant's App. p. 46). The motion was seconded and carried. The record here fits the situation we referred to in *Newman* where "the quantum of legitimate evidence was so proportionately meager as to lead to a conviction [that] the board's finding does not rest on a rational basis." *Newman,* 565 N.E.2d at 353. While there need not be a preponderance of the evidence supporting the Board's decision, there must be at least a scintilla of evidence that Centennial could successfully co-locate on another tower in the area. *Crooked Creek Conservation,*

4. There was mention of a third tower, but it had not been built yet.

677 N.E.2d at 548. We do not find any such evidence in the record, nor do we find any facts supporting the Board's finding that the tower will negatively impact residential property values. For this reason, the Board's Findings and decision are clearly erroneous. *See Ripley County*, 663 N.E.2d at 204. Thus, the Board abused its discretion in denying Network's Petition for a conditional use permit. *Boffo*, 421 N.E.2d at 1125.

### CONCLUSION

For all of the foregoing reasons, we find that the Board's Findings lack not only specificity, but also any evidentiary support. Therefore, the record does not support the Board's decision. Thus, we reverse and remand this cause to the trial court with instructions to enter judgment for Network.

Reversed and remanded.

MATTINGLY–MAY, J., and VAIDIK, J., concur.