**600 LAND, INC., Appellant–Petitioner,**

v.

**METROPOLITAN BOARD OF ZONING APPEALS OF MARION COUNTY, Indiana and Consolidated City of Indianapolis, Appellee–Respondent,**

and

**Kite Realty Group, L.P. and Sybaris Club of Indianapolis, LLC, Appellees–Intervenors.**

No. 49A05–0604–CV–223.

Court of Appeals of Indiana.

March 27, 2007.

340

Scott R. Sikkenga, Kalamazoo, MI, Robert M. Frye, Pool Abbott & Frye, LLP, Indianapolis, IN, Attorneys for Appellant.

Ian L. Stewart, Indianapolis, IN, Attorney for Appellee Metropolitan Board of Zoning Appeals of Marion County & City of Indianapolis.

Michael A. Wukmer, Melanie E. Harris, Brian E. Bailey, Ice Miller LLP, Indianapolis, IN, Attorneys for Intervenor Kite Realty Group.

Offer Korin, Linda L. Vitone, Katz & Korin, P.C., Indianapolis, IN, Attorneys for Intervenor Sybaris Club of Indianapolis, LLC.

## OPINION

ROBB, Judge.

### Case Summary and Issues

600 Land, Inc., an Indiana corporation, appeals the trial court's denial of its motion for partial summary judgment and order affirming the decision of the Metropolitan Board of Zoning Appeals of Marion County (the "BZA"), denying 600 Land's petition for a special exception. On appeal, 600 Land raises three issues, which we restate as: (1) whether the Industrial Zoning Ordinance of Marion County (the "IZO") allows 600 Land to operate a solid waste transfer station and recycling facility on its property without seeking a special exception; (2) whether the BZA's denial of 600 Land's petition was based on sufficient evidence; and (3) whether the procedure through which the BZA denied 600 Land's petition deprived 600 Land of due process. We conclude that the IZO does not allow the operation of a waste transfer station without a special exception. However, we reverse, as we also conclude that the BZA's denial of the petition was not based on sufficient evidence.[1]

### Facts and Procedural History

600 Land owns a parcel of land in Pike Township, Marion County. 600 Land purchased the property with the intent to develop it as a solid waste transfer station and recycling facility. In such transfer stations, trucks bring in solid waste, which is stored temporarily in the station and then loaded onto larger trucks, which transfer the waste to landfills. The property is zoned as I-4-S, the heaviest industrial zoning district under the IZO. However, the IZO does not explicitly list a transfer station as a permitted use in an I-4-S district.

On February 23, 2004, 600 Land filed a Petition for Special Exception, as provided for under the IZO. A number of area property and business owners remonstrated against the proposed special exception, including Kite Realty Group, L.P. ("Kite"), and Sybaris Club of Indianapolis, LLC ("Sybaris"), who both intervened.[2]

---

1. Because we reverse on this basis, we need not address 600 Land's due process argument.

2. " 'An intervenor is treated as if it was an original party and has equal standing with the parties.' " *Hoosier Outdoor Adver. Corp. v. RBL Mgmt. Inc.,* 844 N.E.2d 157, 161 (Ind.Ct. App.2006), *trans. denied* (quoting *Mercantile Nat'l Bank of Indiana v. Teamsters Union Local No. 142 Pension Fund,* 668 N.E.2d 1269, 1271 (Ind.Ct.App.1996)).

Kite is developing a shopping center on a piece of property that lies roughly 700 feet from 600 Land's proposed transfer station. Sybaris owns and operates a hotel in the area.

The BZA held a hearing on 600 Land's petition on May 6, 2004. At the hearing, 600 Land presented evidence including the testimony and report of Nick Tillema, a Certified General Appraiser, indicating that the transfer station would not adversely affect property values, and information relating to its plans for the operation of the station. The Department of Metropolitan Development (the "DMD") Division of Planning Staff (the "Staff") also testified and submitted a report recommending that the BZA approve 600 Land's request. The Remonstrators submitted letters and testimony in opposition to 600 Land's petition, primarily citing concerns over truck traffic, odor, and the resulting effects on neighboring businesses and properties.

After the hearing, the BZA denied 600 Land's petition. After this denial, 600 Land petitioned the trial court for a Writ of Certiorari, challenging the BZA's decision as unsupported by the evidence and arguing that 600 Land was denied due process. After the trial court held a hearing on the writ, the trial court allowed 600 Land to amend its complaint to add a count seeking a declaratory judgment that 600 Land was not required to obtain a special exception in order to operate a transfer station on its property. On September 30, 2005, 600 Land filed a Motion for Summary Judgment on this issue. After a hearing on 600 Land's Motion for Summary Judgment, the trial court issued

an order denying 600 Land's motion on December 21, 2005. The trial court issued its Judgment on 600 Land's challenge to the BZA's decision on March 29, 2006. In its order, the trial court affirmed the BZA's decision and found that 600 Land's due process claim failed. The trial court issued Findings of Fact and Conclusions of Law along with its Judgment. 600 Land now appeals both the trial court's denial of its motion for summary judgment and its order affirming the BZA's denial of its petition for a special exception.

*Discussion and Decision*

## I. Summary Judgment

### A. Standard of Review

■■■ Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. *Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 446 (Ind.Ct.App.2005). As in this case, where the material facts are not in dispute, we will determine whether the trial court correctly applied the law to the facts. *McCarty v. Sanders*, 805 N.E.2d 894, 898 (Ind.Ct.App.2004), *trans. denied.* We may affirm the trial court's grant of summary judgment upon any basis that the record supports. *Rodriguez*, 824 N.E.2d at 446.

### B. Interpretation of the IZO [3]

600 Land argues that the trial court improperly denied 600 Land's motion for

---

**3.** The Appellees argue that 600 Land has waived this issue by not raising it at the initial BZA hearing, and arguing it only after the trial court raised the issue sua sponte. We need not address this issue, as we affirm the

trial court's summary judgment order on the merits. *See State v. Hancock*, 530 N.E.2d 106, 107 (Ind.Ct.App.1988), *trans. denied* ("This court repeatedly has stressed its prefer-

partial summary judgment because 600 Land's use of its land as a transfer station is permitted under the IZO without the grant of a special exception.

■■■ The interpretation of an ordinance, like the interpretation of a statute, is a pure question of law to which we owe the trial court no deference. *T.W. Thom Constr., Inc. v. City of Jeffersonville,* 721 N.E.2d 319, 324 (Ind.Ct.App.1999). We will give every word effect and meaning where possible, and will hold no part of an ordinance meaningless if we can reconcile it with the rest of the ordinance. *Id.* If a term is not defined in an ordinance, we will use its ordinary and plain meaning. *Flying J., Inc. v. City of New Haven Bd. of Zoning Appeals,* 855 N.E.2d 1035, 1040 (Ind.Ct.App.2006). In determining this ordinary meaning, we may use English dictionaries, and consider the word's relationship with other words and phrases used in the ordinance. *Id.* We also point out that zoning ordinances are in derogation of the common law, and that therefore we strictly construe them and interpret them in favor of the free use of land. *Cracker Barrel Old Country Store, Inc. v. Town of Plainfield ex rel. Plainfield Plan Comm'n,* 848 N.E.2d 285, 290 (Ind.Ct.App.2006), *trans. denied.*

■■■ When a zoning ordinance specifies which uses are permitted, those uses not specified are not permitted without a special exception or variance. *T.W. Thom*

*Constr.,* 721 N.E.2d at 325. This construction is based upon the canon of *expressio unius est exclusio alterius,* which directs that when a statute or ordinance enumerates certain things, the necessary implication is that all other things are excluded. *Id.* As the IZO specifies which uses are permitted within certain zoning districts, if 600 Land's proposed use is not identified, the use is permitted only by special exception.

■■■ 600 Land seems to concede this point and instead argues that its use fits within the IZO's definition of a "motor truck terminal," and that it should be allowed because the IZO permits the operation of a "recycling facility," which it claims is a more intense use, in an I–S–3 zoning district.[4]

The IZO defines "motor truck terminal" as "[a] building or area in which trucks, including tractor or trailer units are parked, stored, or serviced, including the transfer, loading or unloading of goods. A terminal may include facilities for the temporary storage of loads prior to transshipment." Appellant's App. at 559.

600 Land argues that trucks will be parked, stored, or serviced at its station, and that therefore, it meets the ordinance's definition of a "motor truck terminal." 600 Land also argues that its transfer of waste is permitted under the definition's provision allowing for the temporary storage of loads. It finally argues

ence for deciding an issue on the merits rather than invoking waiver.").

4. In its brief, Kite states that 600 Land is not arguing on appeal that its proposed transfer facility fits under the IZO's definition of a "recycling facility," and therefore Kite does not address this issue. Although 600 Land does not argue that its facility fits within the IZO's definition of a "recycling facility," it argues that its "proposed use is actually much less intensive than a Recycling Facility," and

that "[t]o permit a Recycling Facility in an I–3–S district, but to deny 600 Land's proposed use as a solid waste transfer facility in the I–4–S zone in which it is located, produces an absurd result." Appellant's Brief at 15–16. Therefore, we will examine 600 Land's proposed use of its transfer facility in comparison to the allowed use of a "recycling facility," while recognizing that 600 Land does not explicitly claim that its use fits within the definition of "recycling facility."

that whether waste is considered "goods" or not is irrelevant, as the ordinance does not require that the station be used for unloading "goods." We find 600 Land's arguments creative, but must conclude that its proposed use does not fit within the ordinance's definition.

■ Although the IZO does not specifically state that the permitted uses allowed in the various districts must be the land's primary use, other provisions in the ordinance lead us to conclude that in order for a use to fit within the definition of a permitted use, that use must be the primary use of the land. IZO section 2.00(A) states: "With the exception of legally established nonconforming uses, no land, building, structure, premises *or part thereof* shall be used or occupied except in conformity with these regulations and for uses permitted by this Ordinance." *Id.* at 478 (emphasis added). Also, the section that lists permitted uses in I–3–S and I–3–U districts, in which *motor truck terminals* are permitted, indicates that uses permitted in I–3 districts "may also include (as accessory or incidental uses thereto) any of the I–4–S and I–4–U District uses specified ... provided that ... [n]ot more than twenty-five (25) percent of the gross floor area of the building(s) (excluding that used for offices or storage) is devoted to said I–4–S or I–4–U uses." IZO § 2.01(C)(23), Appellant's App. at 486. Based on our reading of the IZO as a whole, we conclude that for a use to fall within the definition of a use specifically permitted by the IZO, that use must be the primary use of the land. Therefore, for 600 Land's use of its station to fit within the definition of "motor truck terminal," 600 Land's primary use of its station must conform to the definition.

The Appellees argue that although 600 Land's use of its station may include the parking, storage, and servicing of trucks, these purposes are accessory uses. 600 Land concedes this point,[5] and states that the station's primary use is "a place to temporarily store loads prior to transshipment," *id.*, and that this use fits within the definition of "motor truck terminal." We must disagree.

■ 600 Land argues that solid waste fits within the meaning of "load," which has a common meaning of: "Something that is carried, as by a vehicle, person, or animal," The American Heritage Dictionary of the English Language 1025 (4th ed.2000), or "whatever is put in a ship or vehicle or airplane for conveyance," Merriam–Webster's Online Dictionary, *at* http://www.m-w.com/dictionary/load (last visited February 21, 2007). We agree that under these common definitions, waste falls within the definition of "load." However, given two canons of statutory construction, we conclude that the term "load" is limited by the preceding term "goods."

■ Under the statutory canon of *ejusdem generis*, "where words of specific and limited signification in a statute are followed by general words of more comprehensive import, the general words shall be construed as embracing only such persons, places, and things as are of like kind or class to those designated by the specific words, unless a contrary intention is clearly shown by the statute." *Sanford v. Castleton Health Care Center, LLC,* 813 N.E.2d 411, 419 (Ind.Ct.App.2004), *trans. denied* (quoting *Cunningham v. Bakker Produce, Inc.,* 712 N.E.2d 1002, 1006 (Ind. Ct.App.1999), *trans. denied* ).

■ Second, the statutory construction canon of *noscitur a sociis* "provides that the meaning of a doubtful word may be

5. "600 Land agrees that the parking, storage, and servicing of its trucks is an accessory use and not the facility's primary purpose." Appellant's Reply Brief at 10.

ascertained by reference to the meaning of other words associated with it." *State v. D.M.Z.*, 674 N.E.2d 585, 588 (Ind.Ct.App. 1996), *trans. denied.* In other words, the canon means that a word " 'is known from its associates' and in practical application means that a word may be defined by an accompanying word, and ordinarily the coupling of words denotes an intention that they should be understood in the same general sense." *Id.* (quoting 2A SUTH-ERLAND STATUTORY CONSTRUC-TION § 47.16 at 183 (5th ed.1992)).

With these two canons in mind, we examine the term "loads" as used in the IZO. The definition of "motor truck terminal" first states that the use of the terminal may include the transfer of "goods," and then goes on to say that it may include facilities for the temporary storage of the trucks' "loads." Although the term "loads," when used in isolation, may include any item or material placed on a truck, interpreting the provision's term in that manner would render the use of the more limited term "goods" meaningless. Interpreting "loads" to refer to "goods" also conforms to IZO section 2.13(A), which instructs that when interpreting the IZO's language, "[t]he particular shall control the general." Appellant's App. at 553. We conclude that in the context of the ordinance, the term "loads" allows for the temporary storage of only the "goods" that trucks may transfer, load, or unload at the station. *Cf. Sadler v. State ex rel. Sanders*, 811 N.E.2d 936, 957 (Ind.Ct.App.2004) (although subsection (e) of a statute referred to "the chairman of a political party," reference in subsection (d) to "the state chairman of each political party" limited the scope of subsection (e) to state political party chairmen); *Stratton v. State*, 791 N.E.2d 220, 224 (Ind.Ct.App. 2003), *trans. denied* (concluding that when the legislature used the term "child care worker" in conjunction with "guardian,"

"adoptive parent," "stepparent," and "custodian," the legislature intended that "child care worker" have the same meaning as "guardian," that is, "an individual who occupies a position of trust, authority, and responsibility *in loco parentis* "); *Wiggins v. State*, 727 N.E.2d 1, 7 (Ind.Ct. App.2000), *trans. denied* (where first sentence of statute states that it is a criminal offense to fail to provide "support" to a defendant, and second sentence in statute indicates that offense is enhanced if "the amount of unpaid support" is at least $10,000, court determined that "support," as used in the first sentence includes monetary support, and not just provisions of food, shelter, and clothing).

Having concluded that, as used in the IZO, "loads" means "loads of goods," we must decide whether waste is considered "goods." Neither "waste" nor "goods" is defined in the IZO. 600 Land argues that at this point, we should look to dictionary definitions in order to determine the terms' meanings. However, before turning to outside sources, we note that the terms are used several times throughout the IZO. "Words and phrases in a single section are construed together with the other parts of the same section and with the statute as a whole, in order that the spirit and purpose of the statute is carried out." *Dreiling v. Custom Builders*, 756 N.E.2d 1087, 1089 (Ind.Ct.App. 2001). Also, "[t]erms in a statute will be construed consistently." *Wilson v. Brown*, 461 N.E.2d 1162, 1164 (Ind.Ct.App.1984), *amended on petition for reh'g*, 464 N.E.2d 1332. Therefore, "[w]here words are used one place within a statute, they will be construed as used in that same sense at other places in the statute, unless the clear context of the statute requires a different meaning." *Jones v. State*, 569 N.E.2d 975, 979 (Ind.Ct.App.1991).

First, we will examine the IZO's references to waste. The IZO performance standards for each of its districts contains a provision addressing the "discharge of *waste matter*," directing that "[n]o use shall accumulate or discharge beyond lot lines any *waste matter*" in violation of applicable regulations or in a manner causing harm to the public or injury to property. Appellant's App. at 503 (emphasis added). The IZO development standards contain a provision directing that trash containers larger than forty-eight cubic feet that are also within one hundred feet of a "protected district" must be either screened with a stall, or be visibly screened from the protected district. *Id.* at 499–500. The IZO also has a provision dealing with the requirements for recycling collection points, identifying which "household *waste products*" may be deposited in the containers, and allowing that "[i]n addition to the *materials* listed above, other household scrap made of aluminum, brass, copper, or steel may also be collected at these facilities." IZO § 2.11(D)(2)(a), Appellant's App. at 538–39 (emphasis added). The IZO's provision regulating recycling containers indicates that "*recycling materials* shall be stored within a recycling container," and that "[t]he recycling containers shall be clearly marked to identify the type of *material* which may be deposited." IZO § 2.11(D)(2)(b), Appellant's App. at 539 (emphasis added). The IZO also defines the following terms related to waste:

Recycling Container: Receptacle designed and intended for the collection of cleaned, sorted, solid household *waste products,* including, but not limited to, glass, plastic, metal and paper.

Recycling Facility: A recycling operation, the process by which *waste products* of any type are reduced to raw materials . . .

Recycling Station: A recycling operation involving further processing of household *recycling materials* . . . . Such a facility typically features . . . the storage of the *material* until it is shipped out.

\* \* \*

Trash Container: Receptacle intended for the disposal, collection or temporary storage of unsorted *waste products or refuse.*

Trash Enclosure: An accessory structure enclosed on at least three sides; designed and intended to screen and protect waste receptacles from view, and to prevent *waste debris* from dispersing outside the receptacles or enclosure.

IZO § 2.13(B), Appellant's App. at 560–64. The IZO also defines several terms using the term "goods."

Loading Area: A[n] . . . area maintained and intended for the maneuvering and temporary parking of vehicles while transferring goods or materials to and from a facility.

Loading Space: A[n] . . . area used for the temporary parking of a commercial vehicle while transferring goods or materials to and from a facility.

\* \* \*

Mini–Warehouses: A building . . . containing . . . storage units for the inside storage of customers' goods or wares . . .

\* \* \*

Sign: [A thing] used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests.

\* \* \*

Warehouse: A building used primarily for the storage of goods and materials.

IZO § 2.13(B), Appellant's App. at 557–64.

These provisions related to waste indicate that the drafters of the IZO were

concerned about the presence of waste, and the effect of operations dealing with waste upon surrounding properties, and that when describing waste, the drafters talked about waste "products," "materials," or "matter." The provisions using the term "goods," on the other hand, indicate that the drafters of the IZO thought of the term "goods" as distinct from "materials," as several provisions use both terms. Also, the IZO provisions dealing with "goods" do not express the concerns present in the provisions relating to waste. Although a definition of "goods" would have clarified what the drafters of the IZO meant the term to include, it is apparent from our reading of the IZO as a whole, that "goods" does not include "waste." Therefore, we conclude that 600 Land's proposed transfer station does not fit within the IZO's definition of a "motor truck terminal."

■ 600 Land finally argues that to conclude that its station requires a special exception produces an illogical result, as its proposed use "is actually much less intensive than a Recycling Facility," which is permitted in an I–3–S district without a special exception. Appellant's Br. at 15. The IZO defines a "recycling facility" as "[a] recycling operation, the process by which waste products of any type are reduced to raw materials and may further be transformed into new and often different materials." IZO § 213(B)(92), Appellant's App. at 560. Such a facility "does not include automotive or construction material recycling." IZO § 2.01(C)(13), Appellant's App. at 486. On the other hand, 600 Land's station will accept some automotive and construction materials. *See* Appellee's Supplemental App. at 34–35, 41 (deposition of Scott Fitzgerald). Also, we note that the drafters of the IZO may have permitted recycling facilities out of policy considerations not applicable to transfer facili-

ties. We conclude that our interpretation of the IZO requiring a special exception for a transfer station, but not for a recycling facility, does not produce such an absurd result as to make our interpretation unreasonable.

As we conclude that 600 Land's transfer station does not fit within the IZO's definition of a "motor truck terminal," 600 Land's use of its land as a transfer station requires a special exception. *See T.W. Thom Constr.*, 721 N.E.2d at 325. The trial court properly denied 600 Land's motion for partial summary judgment.

## II.   Sufficiency of the Evidence

### A.   Standard of Review

■ When reviewing a zoning board's decision, we are bound by the same standard of review as was the certiorari court. *Crooked Creek Conservation and Gun Club, Inc. v. Hamilton County N. Bd. of Zoning Appeals*, 677 N.E.2d 544, 547 (Ind.Ct.App.1997), *trans. denied.* The proceedings before this and the trial court are not de novo trials, and we will not reweigh the evidence or reassess witness credibility. *Id.* Both this court and the trial court are limited to determining whether substantial evidence supported the zoning board's decision. *Id.*

■ We have previously recognized that zoning ordinances fall essentially into two distinct categories: (1) those in which the board must grant an exception when the petitioner has demonstrated compliance with certain regulatory requirements, and (2) those under which the board may grant an exception after making findings that the petitioner has complied with more discretionary criteria. *See id.* at 547–48. Under the IZO,

A Special Exception shall be granted following public hearing of the petition and upon the Board's determination that:

a. The grant will not be injurious to the public health, safety, convenience or general welfare.

b. The grant will not injure or adversely affect the adjacent area or property values therein.

c. The grant will be in harmony with the character of the district and land uses authorized therein.

IZO § 2.12(C)(2), Appellant's App. at 552. The nature of these criteria dictates that the BZA in this case had discretion to determine whether 600 Land had met these criteria. *See Crooked Creek,* 677 N.E.2d at 547–48. However, the inclusion of the word "shall" indicates that once the BZA has determined that sufficient evidence has been introduced to meet the three criteria, it has no discretion to deny the petition. *See Town of Merrillville Bd. of Zoning Appeals v. Public Storage, Inc.,* 568 N.E.2d 1092, 1095 (Ind.Ct.App.1991), *trans. denied* (dealing with a similar ordinance and noting that "[o]nce a petitioner has established its right to a special exception by presenting sufficient evidence of compliance with relevant statutory requirements, the exception must be granted").

**B.   Criteria of IZO Special Exception**

■   At the BZA hearing, 600 Land had the burden of proving the IZO's three conditions. *See Crooked Creek,* 677 N.E.2d at 548. Therefore, the BZA could permissibly have based its denial of 600 Land's petition on findings that 600 Land had failed to meet its burden as to any of the three conditions. *See S & S Enters., Inc. v. Marion County Bd. of Zoning Appeals,* 788 N.E.2d 485, 492 (Ind.Ct.App. 2003), trans. denied. Indeed, the Remonstrators were not required to introduce

any evidence at all, and the BZA could have still found that 600 Land had introduced insufficient evidence to satisfy the conditions. *See id.* However, in this case, the BZA did not find that 600 Land had failed to meet its burden, and instead found:

1. The grant will be injurious to the public health, safety, convenience, and general welfare of the community because the proposed facility for the transfer and recycling of waste would establish a heavy industrial use with the resulting odors and increased heavy truck traffic upon a site abutting retail commercial businesses, light industrial businesses, and a dwelling.

2. The grant will injure or adversely affect the adjacent area or property values therein because solid waste transfer and recycling operations would introduce significant odor, as well as heavy truck traffic to the immediate area, which has developed in a light industrial or retail manner or is being used as a dwelling.

3. The grant will not be in harmony with the character of the district and land uses authorized therein because the adjoining properties, as well as the surrounding area, while zoned for heavy industrial use, have developed in a light industrial or retail commercial manner, or are used residentially.

Appellant's App. at 467.

Therefore, we must review the BZA's decision to determine if these findings were supported by substantial evidence.[6]

---

**6.** We recognize, as we did in *Crooked Creek,* the apparent dilemma thus presented for boards of zoning appeals. A zoning board

may in its discretion determine that an applicant has not presented substantial evidence to demonstrate that its proposed use

*See Crooked Creek,* 677 N.E.2d at 548. We do not accept Kite's argument that the BZA's findings merely state that the BZA "concluded 600 Land had not met the statutory criteria," and that it "examined the evidence in light of the statutory criteria, and concluded that it was not satisfied." Kite's Br. at 39. The BZA did not merely find that 600 Land had not met its burden, but affirmatively found, among other things, that 600 Land's station would result in odor and heavy truck traffic harming neighboring properties, and that the transfer station would not be in harmony with the district and land uses permitted therein. It is fundamentally different to state that a party has not met its burden to prove a condition than to find that the evidence presented supports a finding that an opposite condition exists. Moreover, the only way that the BZA could have made its findings was if it had, at least in part, relied upon the evidence put forth by the Remonstrators.[7] The BZA also admitted that it relied upon the Remonstrator's evidence in making its findings. *See* Appellant's App. at 110 (BZA's Brief in Support of Board's Decision) ("[T]he remonstrators testified to odor, truck traffic, and conflict with existing commercial uses and the Board was entitled to rely on that testimony."). We reiterate that it was not the Remonstrators' burden to present evidence to support the BZA's findings. However, because the BZA made its affirmative findings based in part upon evidence presented by the Remonstrators we must determine whether the findings were supported by substantial evidence.

■■■■■■ "[I]n the context of zoning proceedings, evidence is substantial 'if it is more than a scintilla and less than a preponderance.'" *Rice v. Allen County Plan Comm'n,* 852 N.E.2d 591, 597 (Ind.Ct.App. 2006), *trans. denied* (quoting *S & S Enters., Inc.* 788 N.E.2d at 491). Substantial evidence must be "more than speculation or conjecture," and must be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. Therefore, we will conclude that a finding is unsupported if we conclude "the evidence ... was devoid of probative value, that the quantum of legitimate evidence was so proportionately meager as to lead to a conviction the board's finding does not rest on a rational basis, or that the result of the hearing must have been substantially influenced by improper considerations." *Network Towers, LLC v. Bd. of Zoning Appeals of LaPorte County,* 770 N.E.2d 837, 844 (Ind.Ct.App.2002) (quoting

will comply with statutory requirements even in the absence of contrary evidence submitted by remonstrators. The difficulty arises when the zoning board attempts to support its determination. This court has indicated that it would be inappropriate to require the board to provide a detailed explanation as to why the criteria have not been met, for to do so would either force those who object to the exception to come forward with specific evidence in opposition, or would compel the board to explain how the criteria should or could have been met. Both options, we have noted, improperly remove the burden from the applicant to affirmatively prove compliance with the criteria.... However, in the event that boards of zoning appeals deny applications for special exceptions upon grounds that the applicant has failed to carry its burden to show compliance with relevant statutory criteria, boards would be well advised to at least state as much in their findings and to point out what they see as any deficiency in the applicant's evidence. Boards should be able to perform this task without improperly assuming the burden of negating the applicant's case.

677 N.E.2d at 548 n. 1

7. As discussed more fully below, the BZA could not have rationally made its findings relying solely on the evidence introduced by 600 Land.

*Newman v. Spence*, 565 N.E.2d 350, 353 (Ind.Ct.App.1991)).

Pursuant to the IZO's language, 600 Land had the burden of demonstrating each of the three conditions. Therefore, if any of the BZA's findings are supported by substantial evidence, we will affirm. We will address each of the BZA's findings in turn.

### 1. BZA's Finding that the Grant Will Be Injurious to the Public Health, Safety,

### Convenience, and General Welfare of the Community

▇▇▇▇ We note that the special exception ordinance does not refer to the *potential* of a grant to harm the area in some way. *See Network Towers*, 770 N.E.2d at 844–45. Indeed, virtually any use of land has some potential for harm. In the same vein, the BZA may not base its findings upon the speculations or opinions of lay people concerned with the effect of a proposed land use. *See Rice*, 852 N.E.2d at 599 (evidence was insufficient to support board's finding where the "only evidence supporting that conclusion is arguably irrelevant inasmuch as it focuses on past conduct and is no more than speculation and conjecture"); *Network Towers*, 770 N.E.2d at 845 (opinions of remonstrators insufficient to support board's finding that proposed land use would have an adverse effect on property values); *Town of Merrillville Bd. of Zoning Appeals*, 568 N.E.2d at 1095 (where board had before it expert testimony that proposed land use would not harm property values and testimony of two lay remonstrators that they were worried that proposed land use would hurt their property, and remonstrators presented no evidence to support their worry, board's finding that land use would harm

property values was unsupported by sufficient evidence).

Similarly, in this case, no actual evidence supports the BZA's findings relating to its determinations that 600 Land's operation of the transfer station will harm the public health, safety, convenience, or general welfare. The two findings the BZA used to support this determination were that the transfer station would produce odor and "heavy truck traffic." Appellant's App. at 467. There was simply no evidence before the BZA to support either of these findings.

The BZA points to the testimony of Kite's vice president, who testified that the transfer station's presence "to me would seem to be a fairly significant detriment to the leasing of [Kite's] project," and to "the experience of shopping at a development when you are pulling into [Kite's shopping center] and be sitting behind a number of trash trucks." Appellant's App. at 609–10. This is precisely the type of unsupported lay person opinion testimony that is insufficient to support a finding.

Sybaris points to a Remonstrator's testimony regarding an odor he personally smelled in the vicinity of a transfer station owned by a different company.[8] To say that the testimony regarding odors from a transfer station owned by one of 600 Land's competitors is sufficient to support a finding that 600 Land's station will also have odors is akin to saying evidence of one restaurant chain's health code violations is sufficient to determine that a proposed restaurant operated by another restaurant chain will also be unsanitary. This testimony is barely relevant, and insufficient to support a conclusion that 600 Land's station will produce a harmful odor.

Sybaris next points to the Staff report, which states: "The requested use, a solid

---

8. This other transfer facility is located near a

large mulch pile. Appellant's App. at 610.

waste recycling, storage, and transfer station, would be characterized by extensive truck traffic, and would have the potential for extensive noise and odor." Appellant's App. at 405. We first note that the Staff report went on to state: "Given the similar characteristics of the surrounding uses and the separation from any residence or commercial use, the requested use is unlikely to have a significant negative impact on the surrounding properties and should be approved." Id. Also, as stated above, the potential for harm is not a sufficient basis to support the BZA's finding. This report, which ultimately recommended approval of 600 Land's station, is insufficient to support the BZA's finding.

Sybaris also points to 600 Land's "admission" that "[t]o say that waste does not create an odor would be wrong." Appellant's App. at 596. However, the issue is not whether the waste itself creates an odor, but whether the odor produced by the waste will interfere with or harm the other properties in the area. Clearly much of the waste transferred at the station will create an odor. However, such odor will not affect property owners in the area unless the odor is detectable outside of 600 Land's property. 600 Land introduced evidence that its companies have never been cited for an odor problem, and since 2001, have been cited for only a single violation, which was due to lightning striking a station and leaving its overhead doors inoperational. There was simply no evidence before the BZA that could support a finding that 600 Land's station would create an odor that would affect property owners in the area.

We are not unsympathetic to the concern of those in the area that the station may produce a disruptive odor. We point to IZO § 2.05(B)(3), which states: "No use shall emit across the lot lines odorous matter in such quantities as to endanger the public health, safety or welfare, or cause injury to property." Appellants' App. at 507. Therefore, if 600 Land's transfer station does indeed produce a disruptive odor detectable on others' property, those property owners would not be without recourse, as such odor production would leave 600 Land in violation of the IZO. *See Rice*, 852 N.E.2d at 599 n. 3 (noting that "if, after the [land owners] complete their construction, they use their Real Estate in violation of the zoning ordinance, the Zoning Administrator can initiate enforcement proceedings"). We also note that the Indiana Department of Environmental Matters regulates transfer facilities, and has its own requirements regarding odor. *See* 329 Ind. Admin.Code §§ 11–9–2(j)(7), 11–13–5(a), 11–21–8(2); *cf. Network Towers*, 770 N.E.2d at 845 (noting that remonstrators' concerns about potential health effects of communications tower were tempered by FCC regulations designed to minimize potential health effects).

With regard to the truck traffic produced by the station, several Remonstrators expressed their concern that heavy truck traffic in the area would be detrimental. *See, e.g.,* Appellant's App. at 609 (testimony of Kite's senior vice president) ("when you are pulling in ... to go to Galyan's or to go to the grocery store, and be sitting behind a number of trash trucks ... that to me would seem to be a fairly significant detriment"); *id.* at 616 (testimony of Councilor Randolph) ("[H]ow many of us have driven down the road in back of a pick up truck that had garbage falling on the streets ... it will be the kind of folks who are attracted to this site.") Again, these types of unsubstantiated conjectures are insufficient to support the BZA's findings.

On the other hand, Staff member Salzman testified that the additional traffic generated by the station was not a concern

to the DMD because "this is a[n] area located immediately adjacent to a highway interchange, so traffic is a foregone conclusion.... Traffic is why this area is what it is." *Id.* at 632–33. He also noted that the presence of other industrial companies in the immediate vicinity likely caused the area to already be characterized by truck traffic. Also, 600 Land submitted a proposal indicating the daily truck trips related to the station would consist of ten transfer trailers, fifteen pick-up trucks and private citizens, and twenty rear and front load trucks. Therefore, the station would generate ninety inbound and outbound trips per day. The proposal also indicates that the transfer trailers' trips would not occur during rush hour. To put these numbers in perspective, when seeking approval of its land use, Kite had submitted a "Traffic Impact Analysis" indicating that 1,055 northbound and 934 southbound vehicles would pass Kite's entrance during the p.m. peak *hour.* Thus, the ninety *daily* trips associated with 600 Land's proposed transfer station constitute less than five percent of the number of vehicles in the area during the p.m. peak *hour.* Although we recognize that these trucks may differ in nature from other types of vehicles, we cannot conclude that such a small relative increase in traffic constitutes substantial evidence that the station will injure the public health, safety, convenience, or general welfare of the vicinity.

The BZA's findings related to odor and increased truck traffic were unsupported by substantial evidence. Therefore, the BZA's finding that 600 Land's proposed transfer station would injure the public health, safety, convenience, or general welfare of the vicinity was also unsupported, and the BZA's denial of 600 Land's petition on this basis was an abuse of discretion.

2. The BZA's Finding that the Grant Will Injure or Adversely Affect the Adjacent Area or Property Values

▆▆▆ The BZA also supported its determination that the grant would adversely affect the adjacent area or property values therein with the findings relating to truck traffic and odor. In addition to the abovementioned deficiencies, there was no evidence that the transfer station would have any effect upon property values. Indeed, the only actual evidence before the BZA regarding property values was the report of the certified appraiser, indicating that the transfer station would not adversely affect property values. Although several Remonstrators offered opinions or voiced concerns as to the station's effect upon their property value, such unsupported lay opinions do not constitute sufficient evidence to support the BZA's determination. *See Rice,* 852 N.E.2d at 599, 603; *Network Towers,* 770 N.E.2d at 845; *Town of Merrillville Bd. of Zoning Appeals,* 568 N.E.2d at 1095.

The BZA's finding that 600 Land's proposed transfer station would adversely affect the adjacent area or the property values therein was unsupported by substantial evidence, and the BZA's denial of 600 Land's petition on this basis was an abuse of discretion.

3. The BZA's Finding that the Grant Will Not Be In Harmony with the Character of the District and Authorized Land Uses

▆▆▆ The BZA supported its finding that allowing 600 Land to operate a transfer station would not be in harmony with the character of the district or its authorized land uses by stating: "adjoining properties, as well as the surrounding area, while zoned for heavy industrial use, have developed in a light industrial or retail commercial manner, or are used residentially." Appellant's App. at 467.

First, we note that the IZO specifies that the grant must be "in harmony ... with the land uses *authorized* therein." *Id.* at 552 (emphasis added). As the record and the BZA's finding indicate, the surrounding area is principally zoned for heavy industrial use. The landowners in the area who choose to use their land for commercial or other purposes are still authorized to use their land for heavy industrial use. *See id.* at 621 (testimony of Staff member Salzman) (recognizing that land owners using industrial-zoned land for other uses "have not given up their right to any of the [heavy industrial] uses. So come tomorrow they could flip a switch and start operating a sawmill if they so chose."). The BZA's finding that 600 Land's proposed use is not in harmony with the district's authorized uses is not supported by substantial evidence.

■ With regard to whether the transfer station will be "in harmony with the character of the district," we note that this requirement does not mandate that a land use be identical to the uses in neighboring properties. *See Rice*, 852 N.E.2d at 602. Instead, the use must be in agreement, accord, or conformity with the district's character. *See* Black's Law Dictionary 722 (7th ed.1999) (defining "harmony").

Although there was evidence that some of the neighboring properties consisted of corporate offices, a residence, and a daycare, the BZA also had before it evidence that the vast majority of the surrounding area was zoned as I–4–S, the IZO's most intensive industrial zone. Although some of the land uses in the area might not be heavy industrial, evidence that certain *individual properties* within the district are used for non-industrial purposes is insufficient to support a finding that the use would not be in harmony with the character of the *district. See Rice*, 852 N.E.2d at 602 (recognizing that "[w]hile [an adja-

cent neighborhood] may be an important factor," in analyzing a land uses' compatibility with surrounding properties, "it is improper to turn a blind eye to the fact that the Real Estate only borders [the neighborhood] on one side and that there are other properties in the near vicinity that have [similar uses]").

600 Land's property is bordered on three sides by land zoned for heavy industrial use. One of these pieces of property is actually used as a residence, but the other two bordering pieces of property are used for industrial purposes. The other adjacent property, Kite's commercial project, is located over 700 feet to the west of 600 Land's proposed station. 600 Land's proposed transfer station includes plans for landscaping surrounding the buildings on the land, so that its use will be screened from the adjacent properties. The photographs introduced into evidence of the district and of other transfer facilities do not indicate that 600 Land's proposed station is aesthetically distinct or out of harmony with the other structures in the area. *See Town of Merrillville Bd. of Zoning Appeals*, 568 N.E.2d at 1095–96.

Although several land or business owners in the area submitted letters or spoke at the hearing in opposition to the grant of 600 Land's petition, these people gave merely their unsupported opinions that 600 Land's project would not be in harmony with the district. *See* Appellant's App. at 393, 395, 397–403 (letters of Remonstrators generally stating opinions that the project would not be compatible with existing uses, without providing any factual support). These opinions were generally based on the conjecture that 600 Land's project would generate noise, dust, and odor. *See id.* As discussed above, such conjectures made by lay people are insufficient to constitute substantial evidence. Again, we point out that if 600 Land's

station does in fact generate such obnoxious noise, dust, or odor, area property and business owners are not without recourse.

The BZA's finding that 600 Land's proposed use is not in harmony with the character of the district or the land uses authorized therein was unsupported by substantial evidence, and its denial of 600 Land's petition based on this finding was an abuse of discretion.

### Conclusion

We hold that the IZO requires 600 Land to obtain a special exception for the operation of its proposed transfer station, and that the trial court properly denied 600 Land's motion for summary judgment on this issue. However, we conclude that the findings the BZA made in denying 600 Land's petition for a special exception were unsupported by the evidence and that therefore its denial of 600 Land's petition was an abuse of discretion. Thus, we remand to the trial court with instructions to remand to the BZA with instructions to grant 600 Land's petition.

Affirmed in part, reversed in part, and remanded.

BAKER, C.J., and DARDEN, J., concur.