ATTORNEYS FOR APPELLANT
Robert M. Frye
Indianapolis, Indiana

Scott R. Sikkenga
Kalamazoo, Michigan

ATTORNEYS FOR APPELLEES
METROPOLITAN BOARD OF ZONING APPEALS OF
MARION COUNTY, INDIANA, DIVISION ONE AND CITY
OF INDIANAPOLIS

James B. Osborn
Ian Stewart
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
KITE REALTY GROUP, L.P.
Michael A. Wukmer
Melanie E. Harris
Brian E. Bailey
Indianapolis, Indiana



_____

# In the
# Indiana Supreme Court

_____

No. 49S05-0711-CV-513

600 LAND, INC.,

*Appellant (Defendant below)*,

v.

METROPOLITAN BOARD OF ZONING
APPEALS OF MARION COUNTY, INDIANA,
DIVISION ONE AND CITY OF INDIANAPOLIS,
KITE REALTY GROUP, L.P.,

*Appellees (Plaintiffs below)*.

_____

Appeal from the Marion County Superior Court, Civil Div., No. 49F12-0407-PL-1912
The Honorable Michael D. Keele, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 49A05-0604-CV-223

_____

**June 30, 2008**

**Sullivan, Justice.**

600 Land, Inc. is the owner of land in Marion County on which it wants to build a "solid waste transfer station." The County contends that a special exception from the zoning ordinance is required. The land is zoned to permit a "motor truck terminal" to be operated without a special use permit. 600 Land's proposed use qualifies as a "motor truck terminal" because "[a] terminal may include facilities for the temporary storage of loads prior to transshipment."

## Background

600 Land, Inc. purchased an 8-acre parcel of land in Marion County with the intent to develop it as a "solid waste transfer station" and recycling facility. Trucks bring loads of solid waste and recyclables to a "transfer station," a building where the trucks are unloaded, the loads stored temporarily, and then re-loaded onto larger trucks to be taken to incinerators, landfills, or recycling facilities. Marion County has adopted an Industrial Zoning Ordinance (IZO) and under the IZO, 600 Land's property is zoned as I-4-S, the heaviest industrial classification. The IZO does not explicitly list a "solid waste transfer station" as a permitted or prohibited use in an I-4-S district.

The Indianapolis Department of Metropolitan Development (DMD) is responsible for administering the IZO and its staff advised 600 Land that it was required to file a petition for a special exception from the IZO in order to operate the proposed transfer station. 600 Land filed a petition for a special exception with the Marion County Board of Zoning Appeals (BZA), as provided for under the IZO and as advised by the DMD staff. A number of area property and business owners remonstrated against the proposed special exception, including Kite Realty Group, L.P. (Kite) and Sybaris Club of Indianapolis, LLC (Sybaris), who are intervenors in this appeal.[1] The BZA denied the petition after a public hearing. 600 Land then appealed the BZA's denial to the trial court. 600 Land subsequently amended its appeal from the BZA's decision to include a request for a declaratory judgment that the IZO did not require it to obtain a special exception at all because its proposed use qualified as a "motor truck terminal," an explicitly permitted land use in a district zoned I-4-S.

---

[1] Kite and Sybaris were intervenors on appeal; however, Sybaris has not joined in the petition to transfer.

2

The trial court held that (1) the IZO did require 600 Land to obtain a special use exception for this use and (2) affirmed the denial of the special exception. 600 Land appealed. The Court of Appeals (1) affirmed the trial court's determination that a special exception was required, but (2) reversed the BZA's denial of the special exception on grounds that its findings were unsupported by the evidence. 600 Land, Inc. v. Metro. BZA of Marion County, 863 N.E.2d 339, 356 (Ind. Ct. App. 2007). The BZA and Kite petitioned for, and we granted, transfer, 878 N.E.2d 218 (Ind. 2007) (table), thereby vacating the opinion of the Court of Appeals. Ind. Appellate Rule 58(A).

**Discussion**

**I**

Under the Indiana Rules of Appellate Procedure, when the Supreme Court grants transfer, as we have done in this case, the case stands before us in the same procedural posture as it did when initially filed in the Court of Appeals: this Court has "jurisdiction over the appeal and all issues as if originally filed in the Supreme Court." App. R. 58(A). In this appeal, the BZA and Kite seek transfer on grounds that the Court of Appeals incorrectly reversed the BZA's decision denying 600 Land's request for a special exception. 600 Land has not sought transfer from the Court of Appeals determination that a special exception was required. But because the effect of a grant of transfer is to place all issues initially raised in the Court of Appeals before this Court, both the question of whether a special exception was required and the question of whether the special exception was properly denied are before us.

In the Court of Appeals, Kite (but neither the BZA nor Sybaris) argued that the issue of whether a special exception was required was not properly before the court, contending that 600 Land had conceded the point by filing a petition for a special exception in the first place and, in any event, that 600 Land had waived the right to appellate review of the issue by not seeking a determination on the point from the BZA or, for that matter, until amending its complaint in the trial court.

3

We acknowledge that there is some authority from the Court of Appeals in support of Kite's position.[2] See Ayers v. Porter County Plan Comm'n, 544 N.E.2d 213, 217 n.7 (Ind. Ct. App. 1989) (dicta); Children's Home of S.E. Ind., Inc. v. Area Planning Comm'n of Franklin County, 486 N.E.2d 1048, 1051 (Ind. Ct. App. 1985). But for several reasons we have decided to resolve 600 Land's claim on the merits.

First, 600 Land had been advised by the DMD staff that in its view a special exception was required. This gave 600 Land three choices if it wanted to proceed with the project. It could commence work and face injunctive action initiated by the government.[3] It could file a declaratory judgment action in the trial court. Or it could follow the advice of the DMD staff and seek a special exception from the BZA. Given these circumstances, 600 Land took what seems even in retrospect to be the most practical approach, the one that imposed the least burden on the legal system.

Second, we perceive absolutely no prejudice to the BZA or the intervenors from the way things evolved. They had a full and fair opportunity to litigate the issue both in the trial court and Court of Appeals (and here had they chosen to do so). Similarly, because the issue of whether a special exception was required is a question of law, Flying J., Inc. v. City of New Haven Bd. of Zoning Appeals, 855 N.E.2d 1035, 1039 (Ind. Ct. App. 2006), trans. denied, any determination that the BZA might have made on the subject would have been reviewed de novo by the trial court, the Court of Appeals, and this Court.

Third, we find nothing in the record that suggests that the BZA or the intervenors objected in the trial court to 600 Land seeking a declaratory judgment and, as noted above, neither the BZA nor Sybaris contended in the Court of Appeals that it was not available for review. Nor does the BZA or Kite renew the point in their transfer petition, though we acknowledge that the issue did come up in oral argument. Given this history, we perceive at

---

[2] The Court of Appeals found it unnecessary to address Kite's contention because it resolved the issue in Kite's favor. 600 Land, Inc., 863 N.E.2d at 344 n.3.

[3] In all likelihood, work would not be able to be commenced because no work permits would be granted.

least some acquiescence to having the issue resolved on the merits, as both courts below have done.

## II

Turning to the issue of whether 600 Land's proposed waste transfer station is land use permitted by the IZO, we begin by observing that Section 1.00 of the IZO establishes four levels of industrial zoning for suburban areas from I-1-S (least intense industrial uses) to I-4-S (most intense). As noted, 600 Land's property is zoned I-4-S. Section 2.01 lists the various uses that are permitted within these four levels of industrial districts. Waste transfer stations are not specifically referenced in Section 2.01 as a permitted use. But "motor truck terminals" are permitted uses in the heaviest industrial suburban district (I-4-S) without a special exception.[4]

The IZO's definition of "motor truck terminal" consists of two separate sentences:

"[a] building or area in which trucks, including tractor or trailer units are parked, stored, or serviced, including the transfer, loading or unloading of goods. A terminal may include facilities for the temporary storage of loads prior to transshipment."

IZO, § 2.13(B)(70) (Appellant's App. 559.)

600 Land contends that its proposed waste transfer station meets the definition of "motor truck terminal" because it intends to store loads of waste there temporarily prior to shipping them to their final destination and because "it will use the facility to park, store and service its trucks." (Appellant's Br. at 16.) Appellees counter that in order to meet the definition of "motor truck terminal," the facility must transfer, load or unload "goods." They argue that since waste does not constitute "goods," 600 Land's proposed facility fails to satisfy the definition. (Appellees' Brief at 9-10.)

---

[4] The IZO specifies that "motor truck terminals, any acreage" are permitted in the I-4-S and I-4-U heavy industrial zoning districts without a special exception. § 2.01(D)(1)(j) (Appellant's App. 486-87.) The IZO also allows "motor truck terminals less than ten (10) acres in total area" in the I-3-S and I-3-U medium industrial zoning districts. § 2.01(C)(10) (Appellant's App. 485-86.)

"Construction of a zoning ordinance is a question of law." Flying J., Inc., 855 N.E.2d at 1039. "We review questions of law under a de novo standard and owe no deference to a trial court's legal conclusions." Int'l Union of Police Ass'ns, Local No. 133 v. Ralston, 872 N.E.2d 682, 687 (Ind. Ct. App. 2007). "When asked to interpret an ordinance, this court will apply the same principles as those employed for the construction of statutes." T.W. Thom Constr., Inc. v. City of Jeffersonville, 721 N.E.2d 319, 324 (Ind. Ct. App. 1999).

Mr. Scott Fitzgerald and Mr. Rod Perkins, managers for 600 Land, testified in their depositions that the collection trucks used in 600 Land's proposed waste transfer station will be parked, stored, and serviced at the facility. 600 Land's proposed use fits the threshold requirements of a "motor truck terminal" contained in the first sentence of the definition.

Next, 600 Land points us to the second sentence of the definition: "A terminal may include facilities for the temporary storage of loads prior to transshipment." (Appellant's Br. at 13.) It contends that its proposed transfer station's temporary storage of waste before transport to final disposal fits precisely into this part of the definition.

The term "loads" is not defined in the IZO. Undefined words in a statute or ordinance are given their plain, ordinary, and usual meaning.[5] "In determining the plain and ordinary meaning of a term, courts may use English language dictionaries as well as consider the relationship with other words and phrases." Flying J. Inc., 855 N.E.2d at 1040. The term "load" has a common meaning of "[s]omething that is carried, as by a vehicle, person, or animal,"[6] or "whatever is put in a ship or vehicle or airplane for conveyance."[7] The Court of Appeals in this case concluded

---

[5] See Ind. Code § 1-1-4-1(1) (2005): "Words and phrases shall be taken in their plain, or ordinary and usual, sense"; see also City of Jeffersonville, 721 N.E.2d at 324 ("The cardinal rule of statutory construction is to ascertain the intent of the drafter by giving effect to the ordinary and plain meaning of the language used.").

[6] The American Heritage Dictionary of the English Language 1025 (4th ed. 2000), cited in 600 Land, Inc., 863 N.E.2d at 346.

[7] http://www.merriam-webster.com/dictionary/load (last visited June 30, 2008), cited in 600 Land, Inc., 863 N.E.2d at 346.

that "under these common definitions, waste falls within the definition of 'load,'" 600 Land, Inc.,
863 N.E.2d at 346, and we agree.

However, the Court of Appeals went on to conclude that "the term 'load' is limited by the
preceding term 'goods'"; that is, "in the context of the ordinance, the term 'loads' allows for the
temporary storage of only the 'goods' that trucks may transfer, load, or unload at the station."
Id. at 346-47. This too is the position taken by the BZA and intervenors – that a facility must
transfer, load, or unload goods in order to satisfy the definition of "motor truck terminal."

The relevant portion of the definition states that a motor truck terminal is a "building or
area in which trucks, including tractor or trailer units are parked, stored, or serviced, including
the transfer, loading or unloading of goods." IZO, § 2.13(B)(70) (Appellant's App. 559)
(emphasis added). It is undisputed that at a minimum a motor truck terminal must be a "building
or area in which trucks, including tractor or trailer units are parked, stored, or serviced."[8] The
phrase "including tractor or trailor units" refers to "trucks," describing the types of trucks that
can be parked, stored, or serviced at motor truck terminals. Similarly, "including the transfer,
loading or unloading of goods" refers to "serviced," describing the ways that trucks can be
serviced at a motor truck terminal. Neither "including tractor or trailor units" nor "including the
transfer, loading or unloading of goods" are required elements of a "motor truck terminal."
Instead, they both describe their respective antecedent terms: "trucks" and "serviced."

The question thus becomes whether the City-County Council, when it enacted the
ordinance, meant "goods" or something other than the usual and ordinary meaning of the word
"loads" when it used that word in the second sentence of the definition. We think not.

The Court of Appeals came to a contrary conclusion by employing two venerable
"canons" of statutory construction referred to by the Latin expressions "ejusdem generis" and

---

[8] Mr. Larry E. Williams, a DMD representative, testified in his deposition on behalf of the DMD that the only
requirement necessary to meet the definition of a "motor truck terminal" is that it be a "building or area in which
trucks, including tractor or trailer units are parked, stored, or serviced." (Appellant's App. 309, Ex. 25.) Based on
this interpretation, the DMD concluded that a proposed truck wash fit into the definition of a motor truck terminal
because it was a service for trucks. Id. The appellees have not raised any objection to the DMD's interpretation at
either the BZA hearing, the trial court hearing, or in their appellate briefs.

7

"noscitur a sociis." While we acknowledge the utility of these formulations, we find them inapplicable here where the words "goods" and "loads" appear in entirely separate sentences.

The first of these rules – ejusdem generis – applies when a list (or enumeration) of words of specific and limited meaning are followed by words of more general and comprehensive meaning. The general words are then construed as including only those persons, places, or things that are like those designated by the specific words.[9] But here the more general word "loads" does not follow a list of more specific words; indeed, there is no listing or enumeration of persons, places, or things at all. It is true that the more specific word "goods" does appear by itself in the preceding sentence but this is not enough to invoke the logic that animates the canon.

The second rule – noscitur a sociis – is a variation of the first and stands for the proposition that "the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases." 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction 347-48 (7th ed. 2007).[10] The definition of "motor truck terminal" does not group the words "goods" and "loads" together. To repeat, they appear in separate sentences and refer to different antecedents.

The BZA and intervenors make another argument in this regard. The IZO does require a special exception if the proposed use is for "[s]crap metal, junk or salvage storage or operation, open or enclosed, including automobile or truck wrecking or recycling, construction materials

---

[9] The case the Court of Appeals cited for this proposition is a good example. Federal law prohibits conditioning admission to a nursing home on "any gift, money, donation, or other consideration." 42 U.S.C. § 1396r(c)(5)(A)(iii) (2000). In Sanford v. Castleton Health Care Center, LLC, the family of a woman admitted to a nursing home contended that the required arbitration clause in the admitting contract constituted "other consideration" in violation of federal law. By looking at the specific words "gift," "money," and "donation," the court concluded that what the statute was out to prohibit was "charging an additional fee . . . as a prerequisite of admittance"; and that the more general term "other consideration" did not encompass an arbitration agreement because it did not constitute an additional fee. 813 N.E.2d 411, 419 (Ind. Ct. App. 2004), trans. denied (discussing 42 U.S.C. § 1396r(c)(5)(A)(iii)).

[10] Again the decision cited by the Court of Appeals here (and by the Sutherland treatise) provides a good example. At issue in State v. D.M.Z., was a statute that criminalizes certain sexual behavior by a person who is a "guardian, adoptive parent, adoptive grandparent, custodian, or stepparent" of a 16 to 18-year-old child. The question was whether the employee of a child-care worker at a county youth shelter was a "custodian" for purposes of this statute. The court concluded that the "associated words and phrases" – guardian, adoptive parent, adoptive grandparent, and stepparent – indicated a legislative intent that "custodian" was to mean an individual occupying a position of trust, authority and responsibility in loco parentis. The child-care worker did not. 674 N.E.2d 585 (Ind. Ct. App. 1996), trans. denied (discussing I. C. § 35-42-4-7).

recycling, or similar uses." § 2.01(D)(2)(j) (Appellant's App. 487-88.) The BZA contends that 600 Land's proposed use falls under this description thereby triggering the requirement for a special use permit.

We think that the special exception requirement for what we will call the "salvage and storage" use is triggered upon the occurrence of one of two events: (1) some type of processing or transforming – "salvage," "wrecking," "recycling" – of the scrap metal, junk, autos, trucks, construction materials, or similar materials delivered to the site; or (2) "storage" of those materials on the site. We take it as a given that at least some of the material in 600 Land's loads will constitute the materials encompassed by the salvage and storage use special exception. At the same time, we see nothing in the record that suggests that anything like the processing or transforming that would be covered by triggering event (1) will occur at 600 Land's transfer station. The closer question is whether the fact that some of 600 Land's loads will be temporarily stored prior to transshipment constitutes "storage" for purposes of triggering event (2). Here we think the key is in the motor truck terminal's provision for "<u>temporary</u> storage of loads." We believe that the intent of the ordinance is to require a special use permit for any storage <u>beyond a temporary period</u> of the materials covered by the "salvage and storage" use special exception. The record indicates to us that 600 Land's business plan calls for its loads to be transshipped by no later than the next business day after which they arrive at the transfer station. Such storage does not extend beyond a temporary period and does not trigger the requirement for a salvage and storage use special exception.

In summary, the term "loads" in the definition of "motor truck terminal" is not limited by the preceding term "goods." The loads of waste to be hauled in and out of 600 Land's proposed waste transfer station by its collection trucks fit into this common meaning of "loads." 600 Land's proposed use qualifies as a "motor truck terminal" because "[a] terminal may include facilities for the temporary storage of loads prior to transshipment." IZO, § 2.13(B)(70) (Appellant's App. 559.) 600 Land's proposed waste transfer station is a permitted use under the IZO without a special exception.

9

## Conclusion

The judgment of the trial court that 600 Land is required to obtain a special use permit for its transfer station is reversed.

Shepard, C.J., and Rucker, J., concur.

Boehm, J., dissents with separate opinion in which Dickson, J., concurs.

**Boehm, Justice, dissenting.**

I respectfully dissent. The majority concludes that a waste transfer facility is a "motor truck terminal" requiring no special exception under the applicable zoning ordinance. To reach this conclusion the majority parses various provisions of the governing ordinance and cites a number of rules of statutory construction, but in my view fails to deal with those that are central to this case.

It seems to me that if we asked a group of average citizens whether a waste transfer station was a motor truck terminal, we would get at best a tie for the position the majority reaches. I acknowledge that the proposed "waste transfer station" meets the technical definition of "motor truck terminal" because it involves the parking, storing, and servicing of trucks. But the activities of a waste transfer station go beyond that definition. Most people would regard garbage as different for purposes of land use regulation from consumer or industrial products on their way to customers. So as a matter of ordinary English, I find the majority's reading of the ordinance quite strained. But there are also several legal points that the majority does not address.

First, the construction of an ordinance, like construction of a statute, presents a question of law. Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n, 819 N.E.2d 55, 65 (Ind. 2004) (citation omitted). But one rule of law is that in construing an ambiguous ordinance we ordinarily give deference to the interpretation advanced by the administrative agency charged with its enforcement. See St. Charles Tower, Inc. v. Bd. of Zoning Appeals of Evansville-Vanderburgh County, 873 N.E.2d 598, 603 (Ind. 2007) ("The 'interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless [the] interpretation would be inconsistent with the statute itself.'" (quoting LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1257 (Ind. 2000))). For the reasons already given I would find the need for a special exception without resort to any rules of construction. Indeed, the parties were apparently operating on this assumption. The issue was not raised before the BZA, and the trial court sua sponte first raised the possibility that a special exception was unnecessary. But here the City and the BZA argue to this Court that a waste transfer facility is not a "motor truck terminal" as that term appears in the ordinance.

And if that were not enough to defer to the agency's interpretation, the ordinance helps us in this respect. It defines a "motor truck terminal" as a facility "in which trucks . . . are parked, stored, or serviced, including the transfer, loading or unloading of goods." If we dissect this as the majority does, by treating each word and phrase independently of its context, we find that no special exception is required for any facility "in which trucks . . . are parked," which is virtually every imaginable business. Surely no zoning ordinance would contemplate such a loophole, one literally big enough to drive a truck through.

Because I conclude that a special exception is necessary for a waste transfer station, I briefly turn to the issues not reached by the majority: whether the BZA's denial of a special exception was supported by sufficient evidence, and whether the BZA denied 600 Land its right to due process of law at the hearing.

When reviewing a decision of a zoning board, appellate courts are limited to determining whether the BZA's decision was based on substantial evidence. <u>Crooked Creek Conservation & Gun Club, Inc. v. Hamilton County N. Bd. of Zoning Appeals</u>, 677 N.E.2d 544, 547 (Ind. Ct. App. 1997) (citing <u>Ripley County Bd. of Zoning Appeals v. Rumpke of Ind.</u>, 663 N.E.2d 198, 208 (Ind. Ct. App. 1996)). In denying 600 Land's request for a special exception, the BZA made three findings.

1. The grant will be injurious to the public health, safety, convenience, and general welfare of the community because the proposed facility for the transfer and recycling of waste would establish a heavy industrial use with the resulting odors and increased heavy truck traffic upon a site abutting retail commercial businesses, light industrial businesses, and a dwelling.

2. The grant will injure or adversely affect the adjacent area or property values therein because solid waste transfer and recycling operations would introduce significant odor, as well as heavy truck traffic to the immediate area, which has developed in a light industrial or retail manner or is being used as a dwelling.

3. The grant will not be in harmony with the character of the district and land uses authorized therein because the adjoining properties, as well as the surrounding area, while zoned for heavy industrial use, have developed in a light industrial or retain commercial manner, or are used residentially.

Pursuant to IZO section 2.12(C)(2), any one of these findings, if properly supported, would justify the denial of 600 Land's request. I consider the concerns about potential odor and traffic

2

to have questionable support in the record. But I would uphold the BZA on the basis of the third finding—that the waste transfer station would not be in harmony with the character of the district. The record establishes numerous uses of properties in the area, including a bus link, petroleum storage towers, an ammunition manufacturer, a race team, a collision center, a Dow Chemical plant, a day care, a hotel, a Wendy's restaurant, several corporate offices, and a $50 million "upscale lifestyle center" including a movie theater, office buildings, retail stores, and a grocery store. At the BZA hearing, County Councilor Ike Randolph testified that the area was changing: "[W]hen that site was zoned industrial, you know, many years ago, long before I was in the area, Pike was different. Pike was more rural, it wasn't as dense. Things are different now." In my view, this evidence permits the conclusion that a waste transfer station would not be in harmony with the area's current character.

Finally, 600 Land argues that its due process rights were violated because one BZA member prejudged and failed to understand the petition. At the public hearing, after the presentations of 600 Land and the remonstrators, but before 600 Land's rebuttal, BZA Member Alene Crenshaw stated, "I don't have any questions, but I wholeheartedly agree with [Councilor Randolph's opposition to the special exception]. You know you need—they might need the landfill somewhere, but Pike is upcoming community, and we don't need it out there. Thank you." In rebuttal, 600 Land's attorney addressed any misunderstanding by stating, "Let me point out to you again this is not a landfill, this is a transfer station." It is commonplace in judicial oral argument for a judge to express a view as to an issue in the middle of a presentation. This is part of a decision-making process, not evidence of bias amounting to a denial of due process. In any event, at no time did 600 Land object to Member Crenshaw's participation in the hearing or decision. 600 Land therefore waived any claim that its rights were violated. Rumpke, 663 N.E.2d at 210.

I would affirm the trial court's judgment.

Dickson, J., concurs.

3