

IN THE

# Court of Appeals of Indiana

Mykal J. A. Gerou,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Jun 05 2026, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

June 5, 2026

Court of Appeals Case No.
25A-CR-2601

Appeal from the Jefferson Superior Court

The Honorable Blaine S. Goode, Judge

Trial Court Cause No.
39D01-2406-F5-000873

**Opinion by Judge Felix**
Judges May and Mathias concur.

**Felix, Judge.**

## Statement of the Case

[1] Mykal Gerou was convicted of five counts of intimidation for threats he made to multiple people. The trial court sentenced him to 12 years of incarceration with one year suspended to probation. Gerou now appeals and presents three issues for our review:

1. Whether the State presented sufficient evidence at trial to support four of his convictions;
2. Whether the trial court erred by determining part of Gerou's sentence is not subject to Indiana Code section 35-50-1-2(d); and
3. Whether Gerou's sentence is inappropriate under Indiana Appellate Rule 7(B).

[2] We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[3] This case begins not with the criminal conduct for which Gerou was charged and convicted, but with his family's involvement with the Indiana Department of Child Services ("DCS"). On April 27, 2024, DCS received a report of child neglect concerning Gerou and Constance Mueller's newborn child. The next day, DCS Family Case Manager Mary Buxton met with Gerou and Mueller at the hospital. On April 29, DCS removed Gerou and Mueller's child from their care. Buxton informed Gerou of this "in the presence of security," and Gerou stated to security "that it wasn't fair the security officer could carry his gun into the hospital, but that [Gerou] could not." Tr. Vol. II at 108.

[4] DCS filed a petition alleging Gerou and Mueller's child was a child in need of services ("CHINS"). Thereafter, Buxton "had a lot of phone[] calls with" Gerou; during these calls, he "would seem to fly off in a rage in the middle of a conversation," and it was "impossible at times" to "reengage him and bring him back to the topic" Buxton was trying to discuss with him. Tr. Vol. II at 114.

[5] Through the CHINS case, Gerou became a client of Stacey Cornett, a psychotherapist and "service provider for DCS" who conducted "specialty assessments to help parents." Tr. Vol. II at 89–90. Cornett had several phone calls with Gerou before meeting him in person, and Gerou "was very agitated and argumentative" during those calls. *Id.* at 91. Gerou was angry that he had to participate in an assessment and repeatedly talked about "how he's been treated unfairly" by the Michigan Department of Health and Human Services.[1] *Id.* at 92. Cornett's conversations with Gerou "had [her] on high alert," "nervous," and "very scared." *Id.* at 93.

[6] On June 3, Cornett met with Gerou in her office in Madison, Indiana. During the appointment, Gerou "started talking about having a concealing carry and that he had the right to use his [S]econd [A]mendment. . . . [H]e kept saying[,

---

[1] While living in Michigan with a romantic partner, Gerou interacted with employees from the Michigan Department of Health and Human Services regarding his partner's two children of whom Gerou is not the father. *See In re Mueller/Wells*, No. 367427, 2024 WL 2229510, at *3 (Mich. Ct. App. May 16, 2024). Additionally, Gerou has another child, and that child was removed from his care by the Michigan Department of Health and Human Services.

']I have the right to conceal and carry.[']" Tr. Vol. II at 93. Cornett told Gerou, "If you have a gun, I'd like you to take that out to your car. . . . [W]hy don't you take that gun out to . . . your truck." *Id.* at 93–94. Gerou "didn't deny that he had a gun" and "started this patting of his hip, which made [Cornett] think that . . . he was indicating that he had a gun." *Id.* at 94. Gerou "kept ranting about [']I have the right to take this wherever I want. This is my - - I have a concealing carry.['] . . . And in the course of that, he started saying that [']I have the right to do whatever it takes to use my concealing carry to protect my child, children from kidnappers.[']" *Id.* When Cornett tried to redirect the conversation, Gerou started talking about his experiences with the Michigan Department of Health and Human Services and threatened Cornett that she "better not be like the f[*]ckers in Michigan and [she] better give [Gerou] a fair report." *Id.* at 95. Gerou followed this statement with "something to the effect of" "or else," *id.*, or "you will pay," *id.* at 102. At no point during the appointment did Cornett see a firearm. Nevertheless, Cornett "absolutely" took Gerou's statements seriously and "felt very threatened." *Id.* at 96. Cornett refused to return to her Madison office and eventually left Indiana "because of [her] fears of [Gerou's] agitation." *Id.* at 97.

[7] On June 20, DCS held a Child and Family Team Meeting with Gerou at its Madison office. During that meeting, Gerou told Buxton, "Mess with baby bear, you're going to die." Tr. Vol. II at 115. Buxton "interpreted baby bear to mean [Gerou's] child and interpreted him stating that [']messing with the baby bear, you're going to die['] to mean that DCS was what he thought was messing

with his child. Therefore[, Buxton] interpreted it as a threat towards DCS workers, including [her]self." *Id.* When Gerou made this statement, Buxton "did not believe [him] to be carrying . . . a gun or a weapon" because the meeting was in a "public office building" in which weapons are prohibited. *Id.* at 116. However, after Gerou returned to the meeting after briefly leaving— which will be explained in more detail below—he told Buxton that he had just threatened an animal control officer with his gun. This "made [Buxton] believe that [Gerou] likely was carrying a gun even when not on his person in his vehicle." *Id.* at 117. His threat to Buxton combined with his threat to the animal control officer to use a gun did heighten Buxton's concern for her safety and she realized the seriousness of his threat.

[8] While Gerou had been in the meeting with DCS, Madison Animal Control received a call for a welfare check at the DCS building regarding "two dogs in the back of a truck that had a . . . camper [shell] on it." Tr. Vol. II at 127. "[I]t was super hot that day," *id.*, so "people from the building . . . were trying to give the dogs water through the side of the camper shell" because they "were panting really heavily," *id.* at 128. Animal Control Officer Janet Daugherty "got one of the dogs out of the [truck] because he was in distress" and placed it in her air-conditioned vehicle; she decided not to retrieve the other dog due to its aggressiveness and "growling." *Id.* Daugherty's partner then came out of the building with Gerou. Daugherty "was very upset" with Gerou "because [she] had dealt with [Gerou] before with the dogs . . . on the same issue," and the two "started getting into an argument because [Daugherty] asked him about

the dogs being in the back." *Id.* Gerou "started getting in [Daugherty's] face, cussing [her] out, calling [her] all kinds of different names." *Id.* Gerou told Daugherty that "he was going to sick his dog on [her] to bite [her], the one that was acting aggressive." *Id.* at 129. Daugherty believed Gerou's statement and thought she was in danger of being attacked by him had it not been for her partner's presence at the scene. Law enforcement officers arrived and were able to defuse the situation, and Gerou returned to the meeting with DCS.

[9] On June 24, Gerou's attorney in the CHINS case, Alexa Bischoff, called Gerou to discuss the CHINS factfinding hearing that was scheduled for June 28. During this call, "[i]t was hard for [Bischoff] to explain things or talk much because [Gerou] was very upset, angry[,] and talking over" her. Tr. Vol. II at 153. Gerou's anger was directed at "Stacey Cornett, the DCS attorney, [and the] DCS caseworker." *Id.* In particular, Gerou "was angry that his kid had been removed and detained." *Id.* Gerou told Bischoff, "[I]f you take my child, I will kill you. If you come between me and my family, you will die. People are going to die. I will kill people. . . . I always have a gun." *Id.* Gerou also indicated he wanted Cornett "to testify in a certain way and . . . . if she testified in the way that [Gerou and Bischoff] expected, . . . she would pay for it." *Id.* at 154. Bischoff believed Gerou's statements to be "more than just ranting," *id.* at 159, and something "he intended to do," *id.* at 159–60, so "as soon as the phone call was over," Bischoff, believing she had a legal responsibility to do so, reported Gerou's statements to law enforcement. *Id.* at 155. Bischoff "also called a welfare check to Michigan because . . . that's where [Gerou] resided"

and she "was concerned about what he might do to anyone around him." *Id.* at 156. And Bischoff alerted the CHINS court and the local DCS office of Gerou's threats and her safety concerns for people involved in Gerou's case.

[10] The June 28 CHINS factfinding hearing was rescheduled "[b]ecause [Gerou] was continuing to make threats towards DCS workers and anyone involved with the situation with his child at that time," including death threats. Tr. Vol. II at 120. Buxton was especially concerned about the factfinding hearing because Gerou "had made threats to [her] and about [her], and [she] was the one that was going to be telling [Gerou] all of the information that he ultimately didn't want to hear about why his child" should not be in his care. *Id.* at 121. Buxton feared that Gerou "would have a gun in his vehicle, that he could . . . attempt to harm people, to kill people prior to going into the hearing or even leaving the hearing." *Id.*

[11] The State charged Gerou with four counts of intimidation as Level 5 felonies— one count for his threats against Cornett[2] (the "Cornett Count"), one count for his threats against DCS that he made to Bischoff[3] (the "DCS-Bischoff Count"), one count for his threats against DCS that he made to Buxton[4] (the "DCS-Buxton Count"), and one count for his threats against DCS that he made to

---

[2] Ind. Code § 35-45-2-1(a)(4), (b)(2)(A).

[3] I.C. § 35-45-2-1(a)(4), (b)(2)(C).

[4] I.C. § 35-45-2-1(a)(4), (b)(2)(C).

Cornett[5] (the "DCS-Cornett Count")—and one count of intimidation as a Level 6 felony[6] for his threat against Daugherty. A jury found Gerou guilty as charged, and the trial court sentenced him to a total of 12 years of incarceration with 1 of those years suspended to probation. This appeal ensued.

## Discussion and Decision

### 1. The State Presented Sufficient Evidence to Support His Conviction for the Cornett Count and to Support as Class A Misdemeanor Convictions the DCS-Buxton, DCS-Bischoff, and DCS-Cornett Counts

[12] Gerou argues that the State presented insufficient evidence at trial to support his four convictions for intimidation as Level 5 felonies. Our standard of review for such a claim is as follows:

> "A conviction is supported by sufficient evidence if 'there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Hancz-Barron v. State*, 235 N.E.3d 1237, 1244 (Ind. 2024) (quoting *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015)). This Court reviews only the evidence most favorable to the verdict and the reasonable inferences therefrom, and will reverse only where it is shown that "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Teising* [*v. State*], 226 N.E.3d [780,] 783 [(Ind. 2024)].

---

[5] I.C. § 35-45-2-1(a)(4), (b)(2)(C).

[6] I.C. § 35-45-2-1(a)(4), (b)(1)(A).

*Konkle v. State*, 253 N.E.3d 1068, 1090–91 (Ind. 2025). We do not reweigh the evidence or reassess witness credibility. *Id.* at 1090 (quoting *Teising*, 226 N.E.3d at 783). And "it is well-settled that 'circumstantial evidence alone' can sustain a . . . conviction." *Hancz-Barron*, 235 N.E.3d at 1245 (quoting *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016)).

[13] We first address the sufficiency of the evidence supporting Gerou's conviction for the Cornett Count. We then address the sufficiency of the evidence supporting Gerou's convictions for the DCS-Buxton, DCS-Bischoff, and DCS-Cornett Counts (collectively, the "DCS Counts").

### a. The Cornett Count

[14] In order to convict Gerou of intimidation under Indiana Code section 35-45-2-1(a)(4) and (b)(2)(A), the State had to prove beyond a reasonable doubt that Gerou communicated a threat with the intent that Cornett be placed in fear that the threat will be carried out and while committing this offense, Gerou drew or used a deadly weapon. Gerou specifically argues that "there was no evidence he was actually in possession" of a deadly weapon when he threatened Cornett and that even if there was, there was no evidence he drew or used the weapon.[7] Appellant's Br. at 20.

---

[7] Gerou does not challenge any other element of this conviction.

[15] First, the probative evidence and reasonable inferences supporting the verdict show that while in Cornett's office, Gerou "didn't deny that he had a gun" when told to take any gun he may have to his vehicle; he "patt[ed] his hip, . . . indicating that he had a gun"; and referring to his gun, he told Cornett that he had "the right to take this wherever [he] want[s]." Tr. Vol. II at 94. The jury could have reasonably inferred from this evidence that Gerou did, in fact, have a gun on his person in Cornett's office.

[16] Second, "[m]ere possession of a firearm or being 'armed' with a deadly weapon is not enough," *Nicoson v. State*, 938 N.E.2d 660, 665 (Ind. 2010), to satisfy use-of-a-deadly-weapon requirements in our criminal statutes. *See id.* (determining firearm enhancement, which requires "use," was not a double jeopardy violation where defendant's criminal confinement conviction under I.C. § 35-42-3-3(a) & (b)(2)(A) required only that he had been "armed with a deadly weapon"); *Cleveland v. State*, 129 N.E.3d 227, 235–36 (Ind. Ct. App. 2019) (determining defendant only possessed a firearm, so trial court could not order firearm destroyed under I.C. § 35-47-3-2(b), which requires defendant be convicted of "misuse of firearms"), *trans. denied*. As used in the intimidation statute, "use" includes "brandishing, displaying, bartering [sic], striking with, and most obviously, firing or attempting to fire, a firearm." *Daniels v. State*, 957 N.E.2d 1025, 1030 (Ind. Ct. App. 2011) (quoting 94 C.J.S. Weapons § 37 (2001)). For instance, in *Daniels v. State*, this court determined that the defendant "displayed" a gun to his ex-girlfriend "when he deliberately lifted up his shirt to reveal to her that it was tucked into his waistband." 957 N.E.2d at

1030. This was "sufficient evidence that [the defendant] 'used' the gun while intimidating [his ex-girlfriend]." *Id.*

[17] Here, the probative evidence and reasonable inferences supporting the verdict show that Gerou patted his hip to indicate to Cornett that he was armed with a gun. Then, Gerou said that he has "the right to do whatever it takes to use my concealing carry to protect my child, children from kidnappers," Tr. Vol. II at 94, and warned Cornett that she "better not be like the f[*]ckers in Michigan and [she] better give [Gerou] a fair report," *id.* at 95. Gerou followed this last statement with "something to the effect of" "or else," *id.*, or "you will pay," *id.* at 102. Although Gerou did not display his gun as overtly as the defendant in *Daniels*, Gerou clearly used his gun while threatening Cornett by "patting" it, Tr. Vol. II at 94, to let Cornett know he had it on him. Based on the foregoing, we cannot say the State failed to present sufficient evidence to support his conviction for Cornett Count.

### b. The DCS Counts

[18] In order to convict Gerou of intimidation under Indiana Code section 35-45-2-1(a)(4) and (b)(2)(C), the State had to prove beyond a reasonable doubt that Gerou communicated a threat with the intent that another person be placed in fear that the threat will be carried out and the threat is to commit terrorism or made in furtherance of an act of terrorism. In this context, "terrorism" is

> the unlawful use of force or violence or the unlawful threat of force or violence to:

> (1) intimidate or coerce:
>
>> (A) a government; or
>>
>> (B) all or part of the civilian population; or
>
> (2) affect the conduct of a government by use of a weapon of mass destruction, assassination, or kidnapping.

Ind. Code § 35-31.5-2-329.

[19] Regarding the terrorism element of the DCS Counts, the State alleged that Gerou's "threats [were] to commit terrorism," namely "the unlawful threat of force or violence to intimidate or coerce the government, to-wit: the Department of Child Services, an agency of the State of Indiana, with the intent that the Department of Child Services employees be placed in fear that the threat will be carried out." Appellant's App. Vol. II at 179–80, 247. Gerou argues that DCS "is not in and of itself a 'government,'" so the State could not satisfy the "government" element of the terrorism definition. Appellant's Br. at 21. We must agree.

[20] "[W]e review issues of statutory interpretation de novo." *J.Q.R. v. State*, 252 N.E.3d 919, 924 (Ind. 2025) (citing *Bojko v. Anonymous Physician*, 232 N.E.3d 1155, 1158 (Ind. 2024)). We must "give effect to every word and 'eschew those [interpretations] that treat some words as duplicative or meaningless.'" *Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021) (alteration in original) (quoting *Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 836 (Ind. 2020)). Likewise, we

"assume that the language employed in a statute was used intentionally." *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004) (citing *Burks v. Bolerjack*, 427 N.E.2d 887, 890 (Ind. 1981)). We also give the undefined words and phrases used "their plain, or ordinary and usual," meaning. I.C. § 1-1-4-1(1); *see also Morales v. Rust*, 228 N.E.3d 1025, 1054 (Ind. 2024) (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dept.*, 62 N.E.3d 1192, 1195 (Ind. 2016)) ("When interpreting words in a statute, this Court's 'first task' is to assign words their 'plain meaning' . . . ."), *reh'g denied* (Apr. 22, 2024), *cert. denied*, 145 S. Ct. 177 (2024). "The meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases." *ESPN*, 62 N.E.3d at 1198 (quoting *600 Land, Inc. v. Metro. Bd. of Zoning Appeals of Marion Cnty.*, 889 N.E.2d 305, 311 (Ind. 2008)). And in criminal cases, we apply the rule of lenity, which "requires us to construe a penal statute strictly against the State while resolving any ambiguities in favor of the defendant." *Fix v. State*, 186 N.E.3d 1134, 1139 (Ind. 2022) (citing *Meredith v. State*, 906 N.E.2d 867, 872 (Ind. 2009)).

[21] Indiana's criminal code does not define "government," so we must give it its "plain, or ordinary and usual," meaning, I.C. § 1-1-4-1(1); *see also Morales*, 228 N.E.3d at 1054 (quoting *ESPN*, 62 N.E.3d at 1195). "Government" generally means "the body of persons that constitutes the governing authority of a political unit or organization" or "the complex of political institutions, laws, and customs through which the function of governing is carried out."

*Government*, MERRIAM-WEBSTER DICTIONARY.COM (May 10, 2026), https://www.merriam-webster.com/dictionary/government.

[22] Notably, Indiana's criminal code defines the term "governmental entity," which denotes in relevant part (1) "the United States or any state, county, township, city, town, separate municipal corporation, special taxing district, or public school corporation"; (2) "any authority, board, bureau, commission, committee, department, division, hospital, military body, or other instrumentality of any of those entities"; or (3) "a state assisted college or state assisted university." I.C. § 35-31.5-2-144(a). Because our General Assembly has defined "governmental entity" and chose to not use that term in the terrorism definition statute, we must assume that it had a different meaning in mind for "government." *See Pabey*, 816 N.E.2d at 1148 (citing *Burks*, 427 N.E.2d at 890); *Loomis v. ACE Am. Ins. Co.*, 244 N.E.3d 908, 915 (Ind. 2024) (quoting *WTHR-TV v. Hamilton Se. Sch.*, 178 N.E.3d 1187, 1191 (Ind. 2022)) ("[C]ourts 'cannot add words or restrictions,' but must review 'what the statute does—and does not—say.'").

[23] This conclusion is further bolstered by the other words our General Assembly chose to use in the terrorism definition statute. *See ESPN*, 62 N.E.3d at 1198 (quoting *600 Land*, 889 N.E.2d at 311). In particular, "government" is one of two options in Subsection (1)—the other is "all or part of the civilian population." I.C. § 35-31.5-2-329(1). Our General Assembly's decision to associate "government" with "all or part of the civilian population" demonstrates that "government," as used in the terrorism definition statute,

does not encompass a department of state government.[8]  To hold otherwise would require adding "entity" to Subsection (1)(A) of the terrorism definition statute, which we cannot do.  *See Loomis*, 244 N.E.3d at 915 (quoting *WTHR-TV*, 178 N.E.3d at 1191).

[24]  With this in mind, we must decide whether DCS is a "government" as that term is used in the terrorism definition statute.  It is not.  DCS is an Indiana state agency.  As such, it is a governmental entity, I.C. § 35-31.5-2-144(a)(2), but it is not itself a "government" for purposes of the terrorism definition statute, *see supra* ¶ 23.

[25]  Based on the foregoing, the State did not present sufficient evidence to show that Gerou unlawfully threatened force or violence to intimidate or coerce a government.  *See* I.C. § 35-31.5-2-329(1)(A).  Consequently, the State did not present sufficient evidence to establish that Gerou's threats against DCS were threats to commit terrorism.  The State therefore failed to present sufficient evidence to Gerou's convictions for the DCS Counts as Level 5 felonies pursuant to Indiana Code section 35-45-2-1(a)(4) and (b)(2)(C).

[26]  Our analysis does not end there.  "[W]hen we reverse a conviction for insufficient evidence, we may remand to the trial court to enter a judgment of conviction upon a lesser-included offense if the evidence is sufficient to support

---

[8] We do not attempt to define the exact contours of "government" as used in Indiana Code section 35-31.5-2-329(1)(A) because doing so is not necessary to resolve this appeal.

the lesser offense." *W.H. v. State*, 231 N.E.3d 900, 905 n.2 (Ind. Ct. App. 2024) (quoting *Alexander v. State*, 13 N.E.3d 917, 922 (Ind. Ct. App. 2014)); *see also* Ind. Appellate Rule 66(C); *Nunn v. State*, 601 N.E.2d 334, 339 (Ind. 1992) (collecting authorities). Regarding the DCS-Buxton Count, Gerou concedes that the State presented sufficient evidence to support a conviction for intimidation as a Class A misdemeanor pursuant to Indiana Code section 35-45-2-1(a)(4), which is a lesser-included offense. Appellant's Br. at 21.

[27] As for the DCS-Cornett and DCS-Bischoff Counts, Gerou argues that the evidence is insufficient to support convictions for intimidation as Class A misdemeanors pursuant to Indiana Code section 35-45-2-1(a)(4). In particular, Gerou contends that he did not know or have reason to believe that Cornett and Bischoff would repeat his statements to DCS.

[28] "It is well-established that a defendant need not speak directly with a victim to communicate a threat" within the meaning of the intimidation statute. *Peppers v. State*, 152 N.E.3d 678, 683 (Ind. Ct. App. 2020) (citing *E.B. v. State*, 89 N.E.3d 1087, 1091 (Ind. Ct. App. 2017)), *abrogated in part on other grounds by Doroszko v. State*, 201 N.E.3d 1151 (Ind. 2023). "[T]o communicate a threat for purposes of the offense of intimidation, the statement must be transmitted in such a way that the defendant knows or has good reason to believe the statement will reach the victim." *Id.* (citing *Ajabu v. State*, 677 N.E.2d 1035, 1043 (Ind. Ct. App. 1997), *trans. denied*).

[29] In *J.T. v. State*, this court reversed a juvenile's delinquency adjudication for intimidation after concluding that the State did not present sufficient evidence that the juvenile intended to communicate the threat. 718 N.E.2d 1119 (Ind. Ct. App. 1999). In that case, a high school student prepared a document that contained a threat against a fellow student and printed it in the high school library. *Id.* at 1121. A librarian intercepted the document, and the document was passed through several administrators before it was shown to the intended victim. *Id.* at 1121–22.

[30] J.T. appealed the delinquency adjudication for intimidation and argued that there was no evidence that he communicated or attempted to communicate a threat to the student named in the document. *J.T.*, 718 N.E.2d at 1123. This court observed that the State only proved that J.T. intended to print the document containing the threat and that the printed document would be returned directly to him. *Id.* "The printing of a single document, without more, does not constitute a communication to the person named in the document." *Id.* Moreover, J.T. "did not know or have good reason to believe that the document would be intercepted and transmitted through various intermediaries to" the student threatened in the document. *Id.* at 1124.

[31] On the other hand, this court has held that the State presented sufficient evidence that the threat was "communicated" to the victim where the defendant made the threat to a third person who was not a co-conspirator. *B.B. v. State*, 141 N.E.3d 856, 862 (Ind. Ct. App. 2020). In *B.B. v. State*, B.B. repeatedly told a friend that he was going to shoot students at his high school. *Id.* at 858–89,

862. B.B. also showed the friend a "manifesto," which "included statements indicating that B.B. planned to harm others." *Id.* at 858. B.B. was adjudicated a delinquent child for an act that would be considered intimidation if committed by an adult. B.B. appealed, arguing that "the evidence was insufficient because the State failed to prove beyond a reasonable doubt that B.B. knew or reasonably should have known his plans to shoot students at the high school would be communicated to the potential victims." *Id.* at 860. This court disagreed, concluding that because there was no indication B.B.'s friend was a co-conspirator, "a reasonable fact finder could conclude that B.B. knew or should have known that [his friend] would report a plan of mass murder to other students at the high school. [The friend] behaved in a predictable way when he exposed B.B.'s plans." *Id.* at 862.

[32] Concerning the DCS-Cornett Count, like the friend in *B.B.*, Cornett behaved in a predictable way when she repeated Gerou's statements to DCS. Gerou maintains that his statements to Cornett were protected by confidentiality because Cornett is a psychotherapist. There is no evidence in the record demonstrating that Gerou was Cornett's patient or otherwise had a doctor-patient relationship with her. In fact, Cornett was working *on behalf of DCS* for the purpose of assessing Gerou and *providing a report to DCS* thereon. The jury could reasonably conclude that Gerou knew or should have known that Cornett would disclose his threats to DCS.

[33] Concerning the DCS-Bischoff Count, as in *B.B.*, the jury could reasonably conclude that Gerou knew or should have known that Bischoff would report his

plan to kill any DCS employee who "c[a]me between [him] and [his] family," Tr. Vol. II at 153. Bischoff's role as Gerou's attorney does not alter this conclusion. Although lawyers generally have a duty to "not reveal information relating to representation of a client unless the client gives informed consent," Ind. Professional Conduct Rule 1.6(a), a lawyer "may reveal [such] information . . . to the extent the lawyer reasonably believes necessary . . . to prevent reasonably certain death or substantial bodily harm," *id.* 1.6(b)(1). Bischoff behaved in a predictable way when she exposed Gerou's plans. We therefore cannot say the State failed to present sufficient evidence to support his intimidation conviction for his threats against DCS that he communicated to Bischoff.

[34] Based on the foregoing, the State presented sufficient evidence to support intimidation convictions as Class A misdemeanors pursuant Indiana Code section 35-45-2-1(a)(4) for the DCS Counts. Remand is thus appropriate for entry of judgments of conviction upon these lesser-included offenses. *See W.H.*, 231 N.E.3d at 905 n.2; App. R. 66(C); *Nunn*, 601 N.E.2d at 339.

## 2. The Trial Court Did Not Err by Determining Gerou's Sentences for the DCS Counts Are Not Subject to Indiana Code Section 35-50-1-2(d)

[35] Gerou asserts that his sentences for the DCS Counts are subject to the limitations found in Indiana Code section 35-50-1-2(d). The trial court determined these three counts did "not constitute an episode of criminal conduct, in that [they] were not closely related in time, place, and

circumstance," so it ordered Gerou to serve the sentences thereon consecutively. Appellant's App. Vol. III at 181–82. Although we are remanding for the trial court to sentence Gerou on the DCS Counts as Class A misdemeanors, for the sake of judicial efficiency, we address the merits of Gerou's argument.[9]

[36] "Generally, 'it is within the trial court's discretion whether to order sentences be served concurrently or consecutively.'" *Fix*, 186 N.E.3d at 1143 (Ind. 2022) (quoting *Myers v. State*, 27 N.E.3d 1069, 1082 (Ind. 2015)). This discretion is not without limits. *See id.* (citing *Pritscher v. State*, 675 N.E.2d 727, 729 (Ind. Ct. App. 1996)). Indiana Code section 35-50-1-2(d) provides in relevant part that "the total of the consecutive terms of imprisonment to which the defendant is sentenced for convictions arising out of an episode of criminal conduct may not exceed" certain prescribed caps.

[37] An "episode of criminal conduct" refers to "offenses or a connected series of offenses that are closely related in time, place, and circumstance." I.C. § 35-50-1-2(b). "Whether certain offenses constitute a single episode of criminal conduct is a fact-intensive inquiry determined by the trial court." *Fix*, 186 N.E.3d at 1144 (internal quotation marks omitted) (quoting *Schlichter v. State*, 779 N.E.2d 1155, 1157 (Ind. 2002)). "While the ability to recount each charge without referring to the other offers guidance on the question of whether a

---

[9] We do not, however, address Gerou's argument that his sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

defendant's conduct constitutes an episode of criminal conduct, we focus our analysis on the timing of the offenses and the simultaneous and contemporaneous nature of the crimes, if any." *Id.* (internal quotation marks omitted) (quoting *Reed v. State*, 856 N.E.2d 1189, 1200 (Ind. 2006)).

[38] The facts here show that on June 3, while at Cornett's office, Gerou committed intimidation as a Class A misdemeanor when he communicated to Cornett threats against DCS; on June 20, while at a DCS office, Gerou committed intimidation as a Class A misdemeanor when he communicated to Buxton threats against DCS; and on June 24, during a phone call, Gerou committed intimidation as a Class A misdemeanor when he communicated to Bischoff threats against DCS. Gerou did not commit any of these offenses at the same time or at the same location. And it is not difficult to account for one of these offenses without referring to details of the others. *See Fix*, 186 N.E.3d at 1144 (quoting *O'Connell v. State*, 742 N.E.2d 943, 951 (Ind. 2001)). To be sure, all of Gerou's threats were against DCS and in the context of the CHINS case. But there is nothing simultaneous or contemporaneous about the nature of the DCS Counts. We therefore cannot say these three offenses constitute a single episode of criminal conduct such that the sentencing caps in Indiana Code section 35-50-1-2(d) apply.

## Conclusion

[39] In sum, the State presented sufficient evidence to support Gerou's intimidation conviction for threatening Cornett, it presented sufficient evidence to support

intimidation convictions as Class A misdemeanors for the DCS Counts, and the trial court did not err by determining Indiana Code section 35-50-1-2(d) does not apply to cap the sentences for the DCS Counts. We affirm Gerou's conviction for the Cornett Count. We reverse Gerou's Level 5 felony convictions for the DCS Counts. And we remand for the trial court to (1) enter judgments of conviction for intimidation as a Class A misdemeanor pursuant to Indiana Code section 35-45-2-1(a)(4) for the DCS Counts, and (2) sentence Gerou on the revised convictions.

[40] Affirmed in part, reversed in part, and remanded.


May, J., and Mathias, J., concur.

ATTORNEY FOR APPELLANT

R. Patrick Magrath
West Sixth Law, LLP
Madison, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Daniel H. Frohman
Deputy Attorney General
Indianapolis, Indiana